**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
MIDLAND DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| | § | CRIMINAL NO. 4:22-CR-49 |
| v. | § | |
| | § | |
| AGHORN OPERATING, INC., | § | |
| TRENT DAY, and | § | |
| KODIAK ROUSTABOUT, INC. | § | |
| | § | |
| Defendants. | § | |

## REPLY OF DEFENDANTS AGHORN OPERATING AND TRENT DAY TO GOVERNMENT'S RESPONSE (ECF. NO. 35) TO DEFENDANTS' MOTION TO DISMISS COUNT TWO (ECF NO. 28)

### I.      Introduction.

Aghorn Operating, Inc. ("Aghorn") and Trent Day ("Day") have moved to dismiss Count Two – which alleges that they knowingly released H2S "into the ambient air" and "kn[ew] at the time that he thereby place[d] another person in imminent danger of death or serious bodily injury."   42 U.S.C. § 7413(c)(5)(A).

Since 1971, the EPA has defined "ambient air" as "that portion of the atmosphere, external to buildings, to which the general public has access."  In addition, EPA officials have repeatedly announced the position that "the general public has access" to areas beyond a facility's "fence line."   Defendants moved to dismiss because, by that EPA definition, Count Two fails to allege a release into the ambient air, that thereby and at that time created a risk of death or serious bodily injury.  *See* Motion to Dismiss, ECF No. 28.

The government has two responses.  First, the government claims that the term "ambient air" has two different meanings in the Clean Air Act – and a broader meaning in the "endangerment" section of the Act than the "air quality standards" section -- even though the endangerment section was enacted *after* "ambient air" was already defined by regulation.  As set out below, the government's argument violates at least three well-established rules of statutory construction:

> (1) that terms of art in the same statute generally have consistent meanings;
>
> (2) that Congress is presumed to know the existing meaning of a term when it includes the term in amending the statute; and
>
> (3) that all the words in a statute should be given meaning.

Second, the government claims that a  motion to dismiss is procedurally improper, because the indictment parrots the language of the statute by alleging "ambient air."    (Doc. 35) (government response to motion).  This argument also fails: when an indictment not only quotes the statutory language but also adds details describing how the crime was committed, the Court should analyze whether the detailed allegations state an offense.

In Section II below, defendants explain why their claims are properly brought via a pretrial motion to dismiss.  In Section III, defendants explain why their interpretation of § 7413(c)(5) is the correct one.  And, in Section IV, defendants explain why, under the correct interpretation of § 7413(c)(5), the indictment fails to state an offense under that statute.

II.   **Defendants' claims are properly the subject of a pretrial motion to dismiss.**

The government contends that it parroted the words of § 7413(c)(5) and was not obliged to provide further detail in the indictment.  (ECF No. 35, at 2-6)  It is true that Count Two parrots the statute in alleging that Aghorn and Day "knowingly released into the ambient air an extremely hazardous substance, to wit:  hydrogen sulfide, and knew at the time that they thereby placed another person in imminent danger of death or serious bodily injury."  (ECF No. 1, at 9, ¶ 37)

However, whether or not the government was *required* to go beyond a rote recitation of the statute, that is irrelevant ***because here it did so***.  Count Two does not merely parrot the statute: it incorporates large parts of an eight-page preamble of the indictment.  (ECF No. 1, at 9, ¶ 36)  In these circumstances, "'[the court] need not blindly accept a recitation in general terms of the elements of the offense.'"  *United States v. Webb*, 24 F. Supp. 3d 432, 435 (M.D. Pa. 2014) (quoting *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012)). Rather, "[the court] must also look at the specific facts alleged in the indictment to see if an offense has been alleged."[1]  *Webb*, 24 F. Supp. 3d at 435 (citing *Huet*, 665 F.3d at 595). "Although the Government is not required to set forth its entire case in the indictment, 'if the specific facts' that are alleged 'fall beyond the scope of the relevant criminal statute, as

---

[2] This is not merely theoretical:  courts have invoked this rubric to dismiss counts of an indictment for failure to state an offense. *See, e.g.*, *Webb*, 24 F. Supp. 2d at 437-41 (dismissing indictment charging attempted wire fraud and violation of the Travel Act); *United States v. Blitch*, Criminal Action No. 5:08-cr-40 (HL), 2008 WL 5255558, at *2-*3 (M.D. Ga. Dec. 15, 2008) (dismissing counts of indictment charging retaliatory conduct against a witness); *United States v. Acevedo Murillo*, No. CR 07-2026-MWB, 2008 WL 697160, at *2-*3 (N.D. Iowa Mar. 13, 2008) (dismissing count of indictment charging use of an identification document not lawfully issued).

a matter of statutory interpretation,' the indictment fails to state an offense."[2]  *Huet*, 665

F.3d at 595 (quoting *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002)).

That is precisely what happened here.   The indictment alleges a release and deaths

in the pumphouse on an Aghorn lease.   There is no dispute that the lease was surrounded

by a fence, and that the distance from the pumphouse to the northeast fenceline, beyond

which the "public" had access, was some 2,000 feet.   The indictment does not, and cannot,

allege a release to the "public" that "thereby" created an imminent danger of death or

serious bodily injury.   Thus, this motion rises or falls on the statutory definition of "ambient

air," which is a question of law.[3]   And a motion to dismiss is properly considered when the

"infirmity in the prosecution is essentially one of law."   *United States v. Fontenot*, 665

F.3d 640, 644 (5th Cir. 2011) (quoting *United States v. Flores*, 404 F.3d 320, 324 (5th Cir.

2005)).[4]

---

[2] This is not merely theoretical: courts have invoked this rubric to dismiss counts of an indictment for failure to state an offense. *See, e.g.*, *Webb*, 24 F. Supp. 2d at 437-41 (dismissing indictment charging attempted wire fraud and violation of the Travel Act); *United States v. Blitch*, Criminal Action No. 5:08-cr-40 (HL), 2008 WL 5255558, at *2-*3 (M.D. Ga. Dec. 15, 2008) (dismissing counts of indictment charging retaliatory conduct against a witness); *United States v. Acevedo Murillo*, No. CR 07-2026-MWB, 2008 WL 697160, at *2-*3 (N.D. Iowa Mar. 13, 2008) (dismissing count of indictment charging use of an identification document not lawfully issued).

[3] Questions of statutory interpretation are questions of law. *See, e.g.*, *United States v. Clayton*, 613 F.3d 592, 595 (5th Cir. 2010).   Moreover, "[w]hether an indictment sufficiently charges a crime is a question of law, not of fact." *United States v. Contris*, 592 F.2d 893, 896 (5th Cir. 1979) (citation omitted); *see also, e.g., United States v. Lankford*, 196 F.3d 563, 569 (5th Cir. 1999) ("Whether an indictment is sufficient is a question of law . . . .") (citation omitted).

[4] Not all questions of fact are off-limits in the pretrial context.   The Fifth Circuit has observed that "a district court may make preliminary findings of fact necessary to decide the questions of law presented by pre-trial motions so long as the court's findings on the motion do not invade the province of the ultimate finder of fact." *Flores*, 404 F.3d at 324 n.6 (internal quotation marks and citations omitted).

### III.    Definition of Ambient Air: Outside Buildings, Where Public Has Access[5]

#### A.    "Ambient air."

In 1971, the Environmental Protection Agency ("EPA") promulgated a regulation that defined the term "ambient air" in the Clean Air Act ("CAA") as "that portion of the atmosphere, external to buildings, to which the general public has access."  40 C.F.R. § 50.1(e).  (ECF No. 28, at 3)  Over the decades, "the EPA has long exempted from the definition of ambient air 'the atmosphere over land owned or controlled by the source and to which public access is precluded by a fence or other physical barriers,'" *Alaska Wilderness League v. U.S. EPA*, 727 F.3d 934, 936 (9th Cir. 2013) (citation omitted); *see also* ECF No. 28, at 9-11 – including as recently as 2019.  *See also* our Motion to Dismiss, ECF No. 28, at 10-11 (discussing  EPA memoranda and announcements to this effect)).

In 1990, Congress amended the CAA to add the endangerment provision of 42 U.S.C. § 7413(c)(5)(A).  (ECF No. 28, at 3)  This new provision applied to the release of pollutants into the "ambient air," but the amendment gave no new definition to the term.  We do know, however, that Congress debated whether to apply § 7413 to all "air" or only to "ambient air" and specifically chose to enact the House version – which used the term "ambient air" – as opposed to the Senate version -- which would have applied to "air" more generally.  (ECF No. 28, at 3-4, 12)

---

[5] Our original motion (ECF No. 28) sets out many, if not most, of our statutory-interpretation arguments.  In the interest of brevity, we will not repeat those arguments in detail, but rather will simply reiterate them in summary fashion, along with a citation to the page(s) of our motion where those arguments can be found.

The government points out that the 1971 regulation defining of "ambient air" in 40 C.F.R. § 50.1(e) related to the CAA's National Ambient Air Quality Standards ("NAAQS"), codified at 42 U.S.C. § 7409 – as if that means it is irrelevant to the endangerment provision.  In fact, when a term appears twice in the same statute, settled principles of statutory construction favor giving the term the same meaning.  (In addition, as set out below, the purpose of the NAAQS -- to promote public health and avoid premature deaths – is not so different from the purpose of the Endangerment Statute as to require a different meaning of "ambient air.")

### i.      The Presumption of "Consistent Usage"

First, "under the presumption of consistent usage, 'a term generally means the same thing each time it is used'" within a statute. *United States v. Bittner*, 19 F.4th 734, 741 (5th Cir. 2021) (citation omitted), *cert. granted*, 142 S. Ct. 2833 (June 21, 2022) (No. 21-1195). "The presumption applies not only to proximate terms, but 'also when different sections of an act or code are at issue.'"  *Id.* (citation omitted).

### ii.      The Presumption of "Prior Construction"

Relatedly, "the prior-construction canon counsels that a term is to be understood according to earlier, well-settled constructions of the same term."  *Id.* (citations omitted). Congress is presumed to have been aware of the prior regulation defining the term "ambient air," *see id.*, and "Congress' repetition of this term [in § 7413(c)(2)(A)] shows 'the intent to incorporate its administrative and judicial interpretations as well.'  *Id.* (citations omitted).

Courts have used these principles of statutory construction to give an undefined term the same meaning that the term bears in another section of the same act.  For example, in *Law v. Siegel*, 571 U.S. 415 (2014), petitioner Siegel, a bankruptcy trustee, asked the Supreme Court to hold that certain attorney fees did not qualify as "administrative expenses" under 11 U.S.C. § 522(k) of the Bankruptcy Code, even though they did qualify as "administrative expenses" under another section of the Code, 11 U.S.C. § 503(b).  The Court, speaking though Justice Scalia, rejected that argument, noting: Siegel has "give[n] us no reason to depart from the *normal rule of statutory construction that words repeated in different parts of the same statute generally have the same meaning*."  *Id.* at 422 (citations omitted) (emphasis added).

Another example, *M.L. Johnson Family Properties, LLC v. Jewell*, 27 F. Supp. 3d 767 (E.D. Ky. 2014), concerned the meaning of the undefined term "surface owner" in 30 U.S.C. § 1260 of the Surface Mining Control and Reclamation Act of 1977.  Then-United States District Judge Amul Thupar (now on the Sixth Circuit) held that "surface owner" in § 1260 has the same definition given to the term in 30 U.S.C. § 1304(e):

> The definition applies by its terms to § 1304 only, but it still provides important guidance for interpreting § 1260.  *"[W]ords repeated in different parts of the same statute generally have the same meaning*."  *Law v. Siegel*, [571 U.S. 415, 422] (2014) (applying 11 U.S.C. § 503(b)'s definition of "administrative expenses" to the same phrase in § 522(k)).  If Congress intended to depart from that canon in the Act, it left no trail of bread crumbs suggesting as much to the curious reader.

*M.L. Johnson Family Properties*, 27 F. Supp. 3d at 772 (emphasis added).

Perhaps most on point, one court has applied these principles of construction in the very context presented here.  *See United States v. W.R. Grace*, 455 F. Supp. 2d 1172, 1174-

75 (D. Mont. 2006). "Applying the 'normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning,'" *W.R. Grace* held, "it follows that the meaning of 'ambient air' at use in §§ 7407-7410 and the implementing regulations should be applied to § 7413(c)(5)(A)." *Id.*, 455 F. Supp. 2d at 1174. As the court summed up:

> The regulations promulgated by EPA in 1971 explicitly define "ambient air" as the air exterior to buildings and accessible by the public. This regulatory definition is in use to the present day. Congress did not explicitly alter the longstanding regulatory definition when it added the criminal "knowing endangerment" provisions in 1990. Both canons of statutory construction and prior case law compel reading "ambient air" to exclude indoor air.

*Id.* at 1175 (footnote omitted).

But wait, says the government – it is not ***always*** true that identical terms should be construed identically, and it points to *Environmental Defense v. Duke Energy Corp.*, 549 U.S. 561 (2007), as an example of an exception to the general rules of construction. (ECF No. 35, at 16) According to the government, the endangerment section of the CAA is so different from the Ambient Air Standards section that the term "ambient air," which appears in both sections, must have different meanings. (ECF No. 35, at 16) For "endangerment," in § 7413(c)(5)(A), the government would create a new definition of "ambient air" to mean air that is "surrounding," "encircling," "encompassing," or "enveloping" – which it further says means ***all*** air – air inside buildings and air outside buildings, air that is accessible to the general public and air that is not accessible to the general public. (ECF No. 35, at 12-14) And in support of these propositions, the government leans heavily on the decision in *United States v. O'Connell*, Case No. 17-CR-

50, 2017 WL 9360868 (E.D. Wis. Sept. 5, 2017) (magistrate judge's order and recommendation on pretrial motions), *adopted*, 2017 WL 4675775 (E.D. Wisc. Oct. 17, 2017).  (ECF No. 35, at 14-15)

There are numerous problems with the government's analysis.

First, the government does not even acknowledge the existence of the well-established rule of statutory construction -- that identical terms within an act should be construed identically, that Congress is presumed to know prior regulatory definitions.[6] Second, although the presumptions may be rebutted, rebutting them is not easy.  Rather, it requires a showing that "'there is such variation in the connection in which the words are used as reasonably to warrant the conclusion that they were employed in different parts of the act with different intent.'"  *Environmental Defense*, 549 U.S. at 574 *id.* (citation omitted).

*Environmental Defense* was the extraordinary case where the presumption of consistent usage was held to be overcome, and where, therefore, a single statutory term (the term "modification," coincidentally in the CAA) was held to have different meanings because of the vast difference in the contexts in which the term appeared.

Our case is very different.  The National Ambient Air Quality Standards ("NAAQS") program which defined "ambient air" in 1971 is titled "Protection of public health and welfare." 42 U.S.C. § 7409(b) (subsection title).  As summarized by the Congressional Research Service,

---

[6] Likewise, the court in *O'Connell* failed to acknowledge these presumptions – and that failure weakens the persuasive force of that decision.  To apply different meanings, the presumptions have to be overcome.  *See Environmental Defense*, 549 U.S. at 574 ("we presume that the same term has the same meaning when it occurs here and there in a single statute").

the "NAAQS must be designed to protect public health with an adequate margin of safety and to protect public welfare from any known or anticipated adverse effects." *Clean Air Act: A Summary of the Act and Its Major Requirements* 3 (Sept. 13, 2022), https://bit.ly/3GXn1y1; § 7409(b)(1).

Last, year, EPA explained that the "public health" purpose of the NAAQS includes "avoided incidences of [pollution]-related illnesses and premature mortality resulting from emissions reductions." *Regulatory Impact Analysis for the Proposed Reconsideration of the National Ambient Air Quality Standards for Particulate Matter*, at ES-15 (Dec. 2022), https://bit.ly/3WvQFjF.   And even that can be shortened to avoiding "premature deaths and illnesses" — the animating purpose of the NAAQS program.  *Id.*; *see also, e.g., id.* at 5-2 (identifying "the human health effects associated with ambient particles, which include premature death and a variety of morbidity effects associated with acute [and chronic] exposures"); *id.* at 5-17 ("A substantial body of published scientific literature documents the association between [ambient soot] concentrations and the risk of premature death.").

The endangerment statute, § 7413(c)(5)(A), was enacted 20 years later to criminalize certain knowing releases.  But NAAQS and Endangerment – both in the same part of the CAA -- are not so different as to "give us [a] reason to depart from the *normal rule of statutory construction that words repeated in different parts of the same statute generally have the same meaning."*  *Law v. Siegel*, 571 U.S. at 422.  This case is more like *Law* and *M.L. Johnson Family Properties*, discussed above, than *Environmental Defense*.

Taking a leaf from the magistrate judge's opinion in *O'Connell*, 2017 WL 9360868, at *7, the government argues that the *affirmative defense* set out in § 7413(c)(5)(C) proves that "ambient air" includes air inside a building not open to the general public.  (ECF No.

35, at 16-17)   This affirmative defense absolves a defendant of liability where the endangered person "freely consented to" the charged conduct and "the danger and conduct charged were reasonably foreseeable hazards of – (i) an occupation, a business, or a profession . . . ." 42 U.S.C. § 7413(c)(5)(C).  The government seems to reason that this defense could only be applicable to workers within the building or enclosure where the release occurs.  That is not true.

The affirmative defense in § 7413(c)(5)(C) (1) does not mention "workers," and in any event, "workers" do not only work inside of buildings.  The affirmative defense would still apply to workers (or others) outside the fence line, where the conditions precedent for the defense are satisfied.  Thus, our position does not make either § 7413(c)(5)(A) or the affirmative defense in § 7413(c)(5)(C) an "absurdity."  *See generally United States v. Palomares*, 52 F.4th 640, 658 (5th Cir. 2022) (Willett, J., dissenting) (discussing the high hurdle that must be met before the canon against absurdities may be invoked), *pet. for cert. filed* (Dec. 23, 2022) (No. 22-6391).

### iii.   <u>Following the Regulation Will Not Invite a Reign of "Impunity."</u>

Next, the government hyperbolically argues that our interpretation "would absurdly result in corporations being allowed to knowingly expose their own workers to hazardous air pollutants with impunity."  (ECF No. 35, at 1)    Even if this were true, it would not license the Court to write an expansive definition of "ambient air."  But it is *not* true.  Several other laws – civil and criminal – hold companies to account.  On the federal criminal side, the Occupational Safety and Health ("OSH") Act provides criminal penalties

for workplace violations resulting in death, *see* 29 U.S.C. § 666(e), and the Counts Three

through Five of this Indictment allege exactly that.  Likewise, state criminal laws impose

liability where workers are killed or injured – even recklessly or even negligently, not to

mention, "with impunity."   Texas law contains at least the following statutes:

| Offense | Prison | Fine |
|---|---|---|
| Intentional or Knowing Emission of Air Contaminant placing another in imminent danger of death or serious bodily injury[7] | 0-5 yrs[8] | $5,000 – $1 million[9] |
| Reckless Emission of Air Contaminant placing another in imminent danger of death or serious bodily injury[10] | 0-5 yrs[11] | $2,000 – $500,000[12] |
| Manslaughter (Recklessness)[13] | 2-20 yrs[14] | Up to $20,000 or 2x Loss[15] |
| Deadly Conduct (Recklessness)[16] | 0-1 yr[17] | Up to $10,000 or 2x Loss[18] |

*See also* John Gibson, *The Crime of "Knowing Endangerment" Under the Clean Air Act

Amendments of 1990:  Is It More "Bark Than Bite" as a Watchdog to Help Safeguard a

Workplace Free from Life-Threatening Hazardous Air Pollutant Releases?*, 6 Fordham

Envtl. L.J. 197, 222-28 (1995) (discussing the use of such state laws for this purpose).  Of

course, this Court cannot substitute a broader definition than the statute to achieve the goal

---

[7]  Tex. Water Code § 7.183; Tex. Penal Code § 7.22(a).
[8]  Tex. Water Code § 7.187(2)(F).
[9]  Tex. Water Code § 7.187(1)(F).
[10]  Tex. Water Code § 7.182; Tex. Penal Code § 7.22(a).
[11]  Tex. Water Code § 7.187(2)(F).
[12]  Tex. Water Code § 7.187(1)(E).
[13]  Tex. Penal Code § 19.04; Tex. Penal Code § 7.22(b).
[14]  Tex. Penal Code § 12.33.
[15]  Tex. Penal Code § 12.51(b)(1) and (c).
[16]  Tex. Penal Code § 22.05; Tex. Penal Code § 7.22(a).
[17]  Tex. Penal Code § 12.21.
[18]  Tex. Penal Code § 12.51(b)(2) and (c).

of worker protection, but companies will not be able to act "with impunity" if the term "ambient air" in § 7413(c)(5)(A) is given the meaning advanced by the defendants (and the NAAQS regulation).[19]

### iv.    **Presumption That Words Have Meaning and are not Superfluous**

The government's expanded definition of "ambient air" is itself problematic in two respects.    First, to define the word "ambient" as "surrounding," "encircling," "encompassing," or "enveloping" begs the question: *"Surrounding/encircling/encompassing/enveloping" **what***?   If "ambient air" is the air "surrounding/encircling/encompassing/enveloping" the facility responsible for the release, one could easily adopt a definition of "ambient air" like that contained in 40 C.F.R. § 50.1(e) and its accompanying interpretive materials.

Second, the government's definition of "ambient air" -- as all air both inside and outside buildings, where the public has access and where the public does not have access -- effectively renders the word "ambient" superfluous, which violates a third canon of statutory interpretation -- that all the words should be given meaning.   As the Supreme Court has said, is "one of the most basic interpretive canons[ ] that '[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or

---

[19]    Moreover, unlike the OSH Act, which is concerned with worker safety, Congress made clear that the CAA is designed primarily "to promote the *public* health and welfare" from the dangers posed by air pollutants.   42 U.S.C. § 7401(b)(1) (emphasis added).   Indeed, in Congress's statement of its findings and purposes of the CAA -- § 7401 – one searches in vain for any mention of the protection of workers from industrial accidents involving air pollutants.

superfluous, void or insignificant . . . .'"  *Corley v. United States*, 556 U.S. 303, 314 (2009)

(citation omitted).  And, in fact, the United States District Court in *W.R. Grace* specifically

relied on this canon in rejecting the expanded interpretation of "ambient air" espoused by

the government here.  As that court put it: "If 'ambient air' refers to indoor air, the word

'ambient' would be a superfluity, as it would not provide any meaningful modification of

the word 'air.'"[20]  *W.R. Grace*, 455 F. Supp. 2d at 1174.


### v.       The Defendants' Reading is the Best One … but Lenity and Fair Notice Lead to the Same Conclusion

For all these reasons, the best reading of the term "ambient air" in CAA §

7413(c)(5)(A) is the interpretation given to the identical term in CAA § 7409 and defined

in 40 C.F.R. § 50.1(e).  But, "[e]ven if the reader does not consider the issue to be as clear

as [we] do, he must at least acknowledge, [we] think, that it is eminently debatable — and

that is enough, under the rule of lenity, to require finding for the [defendants] here."  *Smith*

v. *United States*, 508 U.S. 223, 246 (1993) (Scalia, J., dissenting).  "In these circumstances

– where text, structure, and history fail to establish that the Government's position is

unambiguously correct – [the courts] apply the rule of lenity and resolve the ambiguity in

[the defendant's] favor."  *United States v. Granderson*, 511 U.S. 39, 54 (1994).  Whether

---

[20] And it would be doubly incongruous to read the word "ambient" out of the term "ambient air," considering that, in enacting § 7413(c)(5)(A), Congress specifically rejected using simply the word "air" in favor of text referring to "ambient air."  (ECF No. 28, at 3-4, 12)  *Cf. United States v. Moss*, 872 F.3d 304, 311-12 (5th Cir. 2017) (examining drafting history of statute to help divine statutory intent).

the rule of lenity requires "grievous" ambiguity or whether "mere" ambiguity is enough,[21] the fair notice/fair warning concerns underlying the rule of lenity[22] require that this Court reject the government's interpretation of the term "ambient air."

**B.** **Who "knows at the time that he thereby" endangers another.**

The second clause of § 7413(c)(5)(A) – "who knows at the time that he thereby places another person in imminent danger of death or serious bodily injury" – is easy to interpret once the correct meaning of the term "ambient air" is settled. The term "thereby" means that the placing in danger must be caused by the release into the "ambient air" referenced in the preceding clause; and the use of the phrase "at the time" means that the requisite knowledge of endangerment must be contemporaneous with the release into the "ambient air."

The consequences are as follows: endangerment of a person does not violate *this* statute unless, and until, there is a release into the "ambient air." If a release never makes it to the ambient air, then there is no endangerment under § 7413(c)(2)(A). The flip side

---

[21] *Compare, Wooden v. United States*, 142 S. Ct. 1063, 1075-76 (2022) (Kavanaugh, J., concurring) (advocating for the "grievous ambiguity" rubric and a limited role for the rule of lenity), *with id.* at 1079-87 (Gorsuch, J., joined by Sotomayor, J.) (rejecting the "grievous ambiguity" rubric and advocating for broader use of the rule of lenity). Although we agree with Justices Gorsuch and Sotomayor on this question, we submit that our interpretation should prevail even under the "grievous ambiguity" rubric.

[22] As the Supreme Court has noted, the due-process doctrine of fair notice/fair warning has several manifestations, including both the vagueness doctrine and the rule of lenity, and these manifestations often overlap. *See United States v. Lanier*, 520 U.S. 259, 266 (1997). In that regard, it is notable that, just a few years after the 1990 enactment of 42 U.S.C. § 7413(c)(5)(A), one commentator presciently observed that given questions about the meaning of the term "ambient air," a defendant might well raise a defense that the knowing-endangerment statute is void for vagueness. *See* Gibson, *supra*, 6 Fordham Envtl. L.J. at 213.

of this coin is that the statute punishes only endangerment of persons in the "ambient air" – in this case, persons outside the fence-line of the Aghorn facility (or at least persons in a public area, outside the pumphouse).  And the defendant must know, at the time of the release into the ambient air, that he has endangered persons in the "ambient air."

### IV.    Count Two of the indictment fails to state an offense.

As explained in Section II, *supra*, the government did not simply charge § 7413(c)(5)(A) in statutory terms, but rather charged it with factual detail, by incorporating many earlier paragraphs of the indictment (ECF No. 1, at 9, ¶ 36 (incorporating ¶¶ 1-2, 4-7, 19-29, and 33).  Therefore this Court must examine those pleaded facts to determine whether they sufficiently allege an offense in "ambient air" under § 7413(c)(5)(A). Under that analysis, this indictment fails to charge either a release of pollutants into the "ambient air," or an endangerment of any persons by a release of pollutants in the "ambient air."

The incorporated paragraphs are clear: Aghorn released H2S from a pump within its pump house on the Foster D lease, (ECF No. 1, at 6, ¶ 26), and H2S was also detected in locations that were not specified to be in the "ambient air."[23]   The only persons alleged to have been endangered by the H2S release were Jacob and Natalie Dean, who by the indictment's terms perished ***inside*** the pump house, not in the "ambient air."  (ECF No. 1,

---

[23] The indictment alleges that "[b]oth bay doors of the pump house were open and dangerously elevated levels of [hydrogen sulfide] were detected."  (ECF No. 1, at 6, ¶ 27)  The place where the hydrogen sulfide was detected, however, was not alleged to be outside Aghorn's fence line, and the reference to the pump house's bay doors suggests that it was well within the fence line.  The same is true of elevated hydrogen sulfide readings taken outside the pumphouse bay doors on October 27, 2019.  (ECF No. 1, at 7, ¶ 29)  Finally, the indictment alleges that hydrogen sulfide readings increased when the deceased Deans were transported to a staging area approximately 300 yards south of the pump house.  (ECF No. 1, at 6-7, ¶ 27)

at 6, ¶¶ 5-6).  The indictment fails to allege that any person in the "ambient air" was endangered by the release of hydrogen sulfide, or that H2S reached an area to which the public had access (outside the fence line) in a concentration sufficient to create a risk of serious bodily injury or death.

## V.     Conclusion

For these reasons, and reasons set out in our motion (ECF No. 28), this Court should dismiss Count Two of the indictment for failure to state an offense.

Respectfully submitted,

/s/ David Gerger
David Gerger
dgerger@ghmfirm.com
Matt Hennessy
mhennessy@ghmfirm.com
GERGER HENNESSY & MARTIN
700 Louisiana, Suite 2300
Houston, Texas 77002
Tel: (713) 224-4400
Fax: (713) 224-5153

/s/ Marla Poirot
Marla Poirot
marla@poirotlaw.com
THE POIROT LAW FIRM, PLLC
PO Box 25246
Houston, Texas 77265
Tel: (713) 816-1660

**ATTORNEYS FOR DEFENDANT
AGHORN OPERATING**

/s/Daniel Hurley
Daniel Hurley
dwh@hurleyguinn.com
HURLEY, GUINN & SINGH
1805 13th Street
Lubbock, Texas 79401
Tel: (806) 771-0700
Fax: (806) 763-8199

/s/Brian Carney
Brian Carney
Brian@carneylawfirm.net
ATTORNEY AT LAW
1202 W. Texas Ave.
Midland, TX 79701
Tel: (432) 686-8300
Fax: (432) 686-1949

**ATTORNEYS FOR TRENT DAY**

## <u>CERTIFICATE OF SERVICE</u>

I filed this motion in the Court's electronic filing system and am emailing a copy to the prosecution the day of filing.

/s/ *David Gerger*

David Gerger