# EXHIBIT 1

2016 WL 1640462
Only the Westlaw citation is currently available.
United States District Court, N.D. California.

UNITED STATES of America, Plaintiff,
v.
PACIFIC GAS AND ELECTRIC COMPANY, Defendant.

Case No. 14-cr-00175-TEH
|
Signed 04/26/2016

**Attorneys and Law Firms**

Jeffrey Benjamin Schenk, US Attorney's Office, San Jose, CA, Andrew S. Huang, Kim Allison Berger, Hallie Mitchell Hoffman, Hartley M.K. West, Owen Peter Martikan, United States Attorney's Office, San Francisco, CA, for Plaintiff.

Benjamin William Snyder, Jonathan Yates Ellis, James Scott Ballenger, Melissa Arbus Sherry, Latham & Watkins LLP, Washington, DC, Eric Matthew Hairston, Walter F. Brown, Orrick Herrington & Sutcliffe LLP, Margaret Tough, Robert E. Sims, Nicole Charlene Valco, Steven Mark Bauer, Christopher James Carlberg, Latham & Watkins LLP, Adam F. Shearer, Kate Dyer, Clarence Dyer & Cohen LLP, San Francisco, CA, for Defendant.

**ORDER ON DEFENDANT'S MOTION *IN LIMINE* TO EXCLUDE TESTIMONY OF GOVERNMENT EXPERT WITNESS HOWARD LUBOW**

THELTON E. HENDERSON, United States District Judge

***1** Defendant Pacific Gas and Electric Company ("PG&E") moved *in limine* to exclude Government expert witness Howard Lubow on March 4, 2016. Dkt. No. 339.[1] Both parties timely opposed and replied in support of this motion. Dkt. Nos. 367, 374. The Court held a hearing on April 20, 2016 to determine whether Mr. Lubow's expert testimony meets the standards set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). After carefully considering the parties' written and oral arguments, the Court now GRANTS IN PART PG&E's motion to limit Mr. Lubow's testimony, as set forth below.

**LEGAL STANDARD**

It is the role of the trial judge to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589. Pursuant to Federal Rule of Evidence ("Rule") 702, a witness "who is qualified as an expert by knowledge, skill, experience, training, or education" may offer expert opinion testimony only if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Expert testimony, as with all testimony, is also subject to Rules 401, 402, and 403. Rule 401 states that evidence is relevant if it "has any tendency to make a fact more or less probable" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. Rule 402 creates a general presumption that relevant evidence is admissible unless otherwise prohibited. Fed. R. Evid. 402. Rule 403 allows the court to "exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

**DISCUSSION**

At the April 20, 2016 hearing, the Government significantly limited the scope of Mr. Lubow's proposed testimony to include only two areas: "the rate-setting process, and utility finance." Apr. 20, 2016 Tr. ("4/20/16 Tr.") at 3 (Dkt. No. 478). On the same day, the parties conferred on and submitted to the Court a revised copy of Mr. Lubow's expert report. *See* Revised Howard Lubow Test. Topics ("Lubow Report") (attached hereto as Ex. 1). On the basis of these agreed upon limitations to Mr. Lubow's expert testimony, PG&E withdrew its objections to Mr. Lubow's expert qualifications and areas of expertise. 4/20/16 Tr. at 9. But PG&E reserved its evidentiary objections to Mr. Lubow's testimony. *Id*. The Court now proceeds to an analysis of the four objections PG&E raised in its motion *in limine* to exclude Mr. Lubow's expert testimony.

**I. Mr. Lubow may not draw conclusions that fall within the province and capability of the jury.**

***2** PG&E argues Mr. Lubow's "proposed testimony about PG&E's 'Corporate Culture,' internal communications, budget constraints, and 'spending reduction tactics' reflects no expertise or expert analysis, just a willingness to summarize evidence in a way the prosecution likes." Def.'s Mot. *in Limine* to Exclude Test. of Gov't Expert Witnesses ("Expert Mot.") at 3 (Dkt. No. 339).

It is certainly true that expert testimony that "simply rehash[es] otherwise admissible evidence about which [the expert] has no personal knowledge...is inadmissible." *Highland Capital Mgmt., L.P. v. Schneider*, 379 F. Supp. 2d 461, 468-69 (S.D.N.Y. 2005). Such evidence is more "properly presented through percipient witnesses and documentary evidence." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 551 (S.D.N.Y. 2004). It is likewise true that expert testimony "must be directed to matters within the witness' scientific, technical, or specialized knowledge and not to lay matters which a jury is capable of understanding and deciding without the expert's help." *Andrews v. Metro N. Commuter R.R. Co.*, 882 F.2d 705, 708 (2d Cir. 1989). *See also* *Fujifilm Corp. v. Motorola Mobility LLC*, No. 12-cv-03587-WHO, 2015 WL 757575, at *27 (N.D. Cal. Feb. 20, 2015) (striking portions of expert report that were "replete with observations and inferences that jurors are perfectly capable of making for themselves without [expert] assistance," even where such sections were "technical in nature"). "In other words, experts should not be permitted to supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence." *In re Rezulin Prods.*, 309 F. Supp. 2d at 541.

However, PG&E identifies very few specific statements from Mr. Lubow's report that it seeks to exclude on this basis, and the Government has since withdrawn each of these statements. Expert Mot. at 3-4; *see also* Lubow Report at 2, 3, 8 (withdrawing all of the following proposed expert testimony: "PG&E clearly placed more emphasis on the realization of earnings than it did on either safety or reliability"; "[c]ommunication between PG&E management and its employees was deficient"; "examples of instances in which employees notified management of issues with PG&E gas operations, and management...underestimate[d] the seriousness of the situation"; and "PG&E constrained spending on maintenance and integrity management in the years just prior to the San Bruno Incident"). Without any remaining objected-to statements to analyze, the Court holds only that it would be improper for Mr. Lubow to "simply rehash otherwise admissible evidence about which he has no personal knowledge," *Highland Capital*, 379 F. Supp. 2d at 468-69, and otherwise invites the parties to heed this limited ruling as they prepare testimony and consider objections for trial.

**II. Mr. Lubow may not opine about PG&E's "corporate intent."**

PG&E argues that Mr. Lubow's "propose[d] testimony aimed at arguing that the underlying evidence reflects an intent to violate the law" is improper. Expert Mot. at 4. The Government concedes, correctly, that experts cannot testify about "corporate intent," but argues that Mr. Lubow will offer only permissible testimony "about corporate practices and policies [that the] jury may use...[to] ascertain[ ] PG&E's intent." U.S.'s Opp'n to Def.'s Mot. *in Limine* to Exclude Expert Witnesses ("Expert Opp'n") at 3 (Dkt. No. 367). The Seventh Circuit considered such expert testimony in the context of a products liability case:

> ***3** District courts must be careful to keep experts within their proper scope, lest apparently scientific testimony carry more weight with the jury than it deserves. [The expert] lacked any scientific basis for an opinion about the motives of GM's designers. He could give an opinion as an engineer that [a design choice] saved a particular amount of money; he might testify as an engineer that GM's explanation for the [design choice] was not sound (from which the jury might infer that money was the real reason); but he could not testify as an expert that GM had a particular motive.

*DePaepe v. General Motors Corp.*, 141 F.3d 715, 720 (7th Cir. 1998). The Government argues that "Lubow's testimony will go no farther than what the Seventh Circuit allowed in *DePaepe*; he will testify regarding PG&E's safety practices and allocation of financial resources," and it will be left to the jury to draw conclusions about PG&E's intent. Expert Opp'n at 3-4.

The Court will hold the Government to its correct concession that Mr. Lubow may not opine as to PG&E's intent, and otherwise agrees with the Government that Mr. Lubow may testify regarding PG&E's corporate practices and policies on financial resourcing. As "a consultant with 40 years of experience in the fields of utility regulation, accounting, finance, and operations," Opp'n at 2, Mr. Lubow possesses the specialized knowledge that will be necessary to assist the jury in understanding PG&E's financial policies and practices.

**III. Mr. Lubow may not testify about "industry standards of care."**

PG&E argues that Mr. Lubow's testimony that, for example, PG&E's "threshold for acceptable gas safety performance was set unacceptably low at times," is both irrelevant and highly prejudicial because "it risks misleading the jury into thinking that something other than the specific words of the regulation matter in this regulatory criminal case." Expert Mot. at 5-6.

Again, the Government has since withdrawn the complained of testimony. Lubow Report at 2. But whatever the Government now argues, it has previously stated Mr. Lubow would testify regarding "industry standards of care." Def.'s Status Report, Ex. 1 at 2 (Dkt. No. 321-2). And PG&E is correct that any expert testimony on "industry standards of care" would confuse the issues in this criminal prosecution, where the required mental state is "knowing and willful" violation of the minimum federal safety standards set forth by the Pipeline Safety Act. 49 U.S.C. § 60123. Accordingly, Mr. Lubow is prohibited from testifying in any manner that would invite the jury to substitute another "standard of care" for the "knowing and willful" violations that the Government must prove.

**IV. The Court need not address the sufficiency of Mr. Lubow's expert opinions on CPUC-approved expenditures.**

The Government has withdrawn Mr. Lubow's proposed expert testimony about CPUC-approved expenditures. Lubow Report at 2-3; 4/20/16 Tr. at 3. PG&E's arguments that such would be improper expert testimony, Expert Mot. at 6-9, are therefore moot.

**CONCLUSION**

For the foregoing reasons, the Court limits Mr. Lubow's expert testimony as discussed above, and otherwise DENIES PG&E's motion.

**IT IS SO ORDERED.**

EXHIBIT 1

**Howard Lubow**
**Testimony Topics**

**Mr. Lubow's qualifications and experience**

- Lubow resume.

**Overland's scope of review included but was not limited to:**

- Recent Overland reports concerning PG&E
- The NTSB report regarding the San Bruno incident
- Relevant documents identified during discovery
- Grand jury testimony
- Interview notes of potentially relevant witnesses
- Recent, relevant CPUC decisions
- SED report regarding the San Bruno incident
- Subpoenas and associated responses from PG&E
- Subpoenas and associated responses from the USDOJ
- Relevant standards and regulations

Although Mr. Lubow has reviewed these materials, his testimony will be based upon the PG&E 10Ks and proxy statements provided with his disclosure.

Organizational changes are out, except changes in publicly reported compensation (from 10Ks and proxies) from 2006-2009.

~~**Overview of PG&E's organization and how it has changed over time**~~

- ~~PGE Corp. ran the business on a centralized basis—financial implications on cash management and funding requirements for Gas T&D~~
- ~~T&D runs on a centralized basis within the Gas Division~~
- ~~During most of the relevant period, T&D supervisors ran both electric and gas, reducing the emphasis and visibility of gas operations~~
- ~~Gas and electric operations were eventually separated~~
- ~~Post San Bruno—significant reorganization and priority on safety; changes in senior management~~

~~**See Organizational Changes Support attached**~~.

~~**Corporate Culture**~~

~~Generally speaking, the corporate culture of an organization consists of the beliefs and associated behaviors that characterize how its management and employees interact with each other and transact business with third parties. Whether formal or informal in nature, it is typically set by management and adopted by the organization's workforce.~~

~~**Focus of management was on financial results which, at times, was to the detriment of safety**~~

~~Although many of PG&E's core organizational documents such as its vision and values statements touted the importance of customer needs and safety, management actions demonstrated that these were not necessarily a priority. For example, metrics used by management in measuring the success of the organization routinely excluded any that were associated with work quality and public safety while at the same time including those tied to earnings and cost savings. In planning documentation from mid-~~

Page 1 of 11

~~2008, PG&E clearly placed more emphasis on the realization of earnings than it did on either safety or reliability. When discussing Gas Transmission goals in late 2009, PG&E management conceded that among the greatest risks to achieving the cost-saving goals totaling over $20 million was the reduced reliability of the system. Documents relied upon in reaching this conclusion included the following:~~

- ~~PGE_DOJ_6760045 – PGE_DOJ_6760047~~
- ~~PGE_DOJ_6759919 – PGE_DOJ_6759932~~
- ~~PGE_DOJ_6760801 – PGE_DOJ_6760813~~

~~Overland is not the only third party to reach such a conclusion. The independent review panel investigating the San Bruno incident concluded that PGE&'s top management placed an excessive emphasis on financial performance to the exclusion of system integrity management (p. 7). The SED found that PG&E emphasized profits over safety (p. 3), and in years past, Arthur Andersen characterized the company's treatment of preventative maintenance as a "control valve" for managing overall division expenditures to budget (Arthur Andersen August 1995 Preventive Maintenance Program Review of PG&E, p. 32).~~

~~The Company's 2011 Gas Turnaround Plan concedes that past capital expenditures funding was historically influenced by an interest in reducing spending, and that there was "very little focus on public safety."~~

~~**For PG&E, the threshold for acceptable gas safety performance was set unacceptably low at times**~~

~~While the company promoted a vision of being "the leading utility in the United States", its actions did not always correspond with this lofty goal. Depending on the performance target, median performance was sometimes considered to be acceptable by company management. Initiatives in 2010 included one that simply stated "perform only mandatory or business critical pipeline maintenance projects". And as recently as 2011, executive management judged process safety as inadequate and acknowledged that safety and compliance were considered synonymous within PG&E even though compliance should have been viewed as the bare minimum that was required. Documents relied upon in reaching this conclusion included the following:~~

- ~~PGE_DOJ_6759295 – PGE_DOJ_6759315~~
- ~~PGE_DOJ_6760983 – PGE_DOJ_6761032~~
- ~~The Gas Turnaround Plan presented by Nick Stavropoulos on October 26, 2011~~

~~**See Gas Safety Performance Support attached.**~~

~~The independent review panel investigating the San Bruno incident also found that PG&E's focus was on integrity management compliance rather than being an industry leader in pipeline safety (p. 9).~~

~~**PG&E often and continuously underspent CPUC authorized expenditures, resulting in earnings that exceeded authorized levels**~~

~~PG&E was observed to have underspent its approved level of expenditures over an extended period of time in both its gas distribution and gas transmission operations. CPUC approved expenditures were set at levels to maintain a system that was safe for both the public and the company's employees. By under-spending, PG&E was profiting at the expense of this safety. While PG&E argued that this was not~~



~~the case, it is undeniable that the Company cut funding for safety to increase profits. As a result, PG&E earned profits above authorized and approved levels.~~

- ~~Overland Report on PG&E's Gas Transmission Pipeline Safety-Related Expenditures (Chapters 3 and 4)~~
- ~~Overland Report on PG&E's Gas Distribution Operations (Chapters 3 and 4)~~
- ~~PGE_DOJ_0440736~~

~~**See Expenditures Support attached.**~~

~~**Communication between PG&E management and its employees was deficient**~~

~~There are many examples of instances in which employees notified management of issues with PG&E gas operations, and management chose to ignore or underestimate the seriousness of the situation. Management also had a tendency to disregard input from employees that was at odds with the "company line". Employees were left with the impression that management did not place a high priority on public safety. As a result, problems festered and grew over time. Documents relied upon in reaching this conclusion included the following:~~

- ~~Arthur Andersen August 1995 Preventive Maintenance Program Review of PG&E~~
- ~~USA_SBOII 0015254 – USA_SBOII_0015260~~
- ~~PGE_DOJ_0986323 – PGE_DOJ_0986325~~
- ~~PGE_DOJ_6759978 – PGE_DOJ_9759992~~
- ~~PGE_DOJ_6758595 – PGE_DOJ_6758601~~
    - ~~Environment goes back to at least early 1990s~~
    - ~~In spite of many reports issued over time that identified deficiencies in management practices, effective solutions were never implemented~~

~~**See Internal Communication Support attached.**~~

## ~~Timeline of key dates~~

~~Provides a chart showing key economic, industry, and PG&E events over time.~~

~~**See Timeline Support attached.**~~

## Regulation overview

In order to understand financial incentives for the PG&E management and Board of Directors, it is necessary to understand the commitments a regulated utility must make to hold a certificate of service, allowing a franchise right to provide regulated services on a monopoly basis. Utilities make the following general commitments.

- Must provide safe, adequate and reliable service
- Provide service at fair and reasonable rates
- Rates charged must be economically efficient and nondiscriminatory



Utility regulators, among other things, oversee utility operations to insure that safe, adequate and reliable service is being provided at reasonable costs to customers. In this context, regulators set prices for utility services in the absence of efficient competitive markets necessary to provide an environment for price efficiency.

Over the last thirty years or so, certain services previously price regulated are now set in a competitive market environment. Clear examples of utility services that have been largely deregulated over time would include telecommunications services, electric generation services, and gas supply services.

**Understanding of ratemaking process – in general; in California.**

PG&E provides gas transmission and distribution services to its customers subject to California Public Utilities Commission regulation. PG&E prices are determined as a result of utility filings concerning historic and projected costs. This information is subject to review by parties of interest in public proceedings. Upon review of this evidence, PG&E is allowed to charge approved rates for services regulated by the Commission. These rates are based on the utility's cost of providing service, plus a level of earnings or profit necessary to compensate shareholders for their investment in the company.

PG&E cannot earn profits outside of a reasonable range because it is a regulated utility company. Most companies are not price regulated, and the prices they charge to their customers are determined by market factors, rather than their own costs. Since the prices they charge are not determined by their own production costs, they attempt to maximize profits. However, prices charged by PG&E to their customers are directly linked to its costs over time. As a result, PG&E has a much lower financial incentive to cut its costs than non-price regulated companies.

**See Regulation Support attached.**

**There are limits on regulated utility profits – no incentive to maximize profits**

Regulated utilities are allowed a return necessary to induce investors to contribute capital necessary to meet investment and operations requirements. If a utility is earning substantially less than its authorized rate of return, it would have an incentive to request regulators to review their costs, and raise rates sufficient to improve earnings. On the other hand, if a regulated utility is earning substantially more than regulators have previously authorized, the regulators are likely to require the utility to file evidence to "show cause" why its customer rates should not be reduced.

The process in California for setting customer rates provides for a periodic review of utility investment and operating costs. For this reason, PG&E can only increase profits over expected authorized levels in the short-run. That is, the Commission may agree to a particular level of assumed investment and operating costs when it sets rates. PG&E may then attempt to cut its costs from authorized levels, which would result in somewhat higher earnings than the expected or authorized rate of return. However, when the Commission reviews these costs on an historic basis in a sequent case, the Commission may adjust their investment and operating cost assumptions downward to account for these lower actual versus previously expected costs.

**Short-term focus on earnings by utility management runs counter to long-term profit potential – investment; expenses in rates based on historical data as well as projections**

In light of this general ratemaking process, while utilities try to prudently manage costs, they do not impose austerity measures to unreasonably restrict investment and operations necessary to provide



safe, adequate and reliable service. While such a strategy may be successful in the short-run in increasing earnings for shareholders, it is counter-productive as a long-term strategy.

In the longer-term, utilities are able to increase earnings to levels consistent with added investment requirements. For this reason, utilities will actually experience growth in earnings by investing more in necessary capital projects – not less. Of course, aside from this financial incentive to invest to improve earnings growth, utilities must invest to meet their obligation to provide safe, adequate and reliable service.

~~Because regulators look at historic investment and operating costs, as well as forecast estimates, a strategy of under-funding utility operations will limit long-term financial results and earnings growth potential. To enhance short-term earnings results enough to translate into perceived growth in shareholder returns, aggressive austerity measures must be applied. Because of periodic regulatory review of actual and forecasted costs, this strategy becomes more difficult and more extreme over time. Given this incentive for a regulated utility to increase its investment base to improve its earnings potential, regulators tend to be more concerned over unneeded capital investment.~~

~~**Regulators often worry more about utility management implementing a strategy of over-investing and over-spending in Operations – incentive regulation put in place to mitigate this incentive**~~

~~Since the San Bruno incident, PG&E has in fact changed its investment strategy to significantly expand its capital expenditures program. While various proceedings were initiated by the Commission to address deficiencies in the gas transmission and distribution systems, the practical result has been to expand the PG&E earnings potential and an increase in shareholder returns.~~

~~In order to create more of a balanced incentive for utility investment and operations costs, over the last twenty years or so, there has been more of an interest in creating incentives in rates to manage costs to the mutual benefit of customer and utility shareholders.~~

~~**California S&P ratings regarding regulation**~~

~~Utility Commissions are rated by S&P and other independent companies in terms of their level of support to regulated utilities. This is generally measured in terms of policies that may result in the ability to earn authorized returns, and the general effectiveness of cost recovery mechanisms.~~

~~California is rated favorably when measured against most other state regulators. This is important, as there is more incentive, not less, to invest in a regulatory environment that adequately recognizes costs on a timely basis.~~

~~**See Regulatory Environment Ratings Support attached.**~~

## Compensation levels and performance criteria of executives, including comparison to peers

The internal planning documents show an abnormal focus on earnings and earnings growth, when measured against other corporate goals such as public safety and system reliability. Furthermore, PG&E's proxy statements show that before 2011 public safety goals were not factors in the incentive compensation that was available to the named executive officers listed in the proxy statements.



WESTLAW © 2024 Thomson Reuters. No claim to original U.S. Government Works.

It is highly abnormal, based on general industry practice, to restrict cash flows for capital investment and operations to manage earnings outcomes, which supported the basis for senior management incentive awards. Because of its ability to recover its investment and operating costs in rates, the Company should have had little, if any, incentive to restrict gas business unit capital and operating budgets from levels recommended to assure safe, adequate and reliable service.

For the period reviewed, 2002 to 2012, and extending to years prior to this timeframe, PG&E gas operations was run as if it were under austerity conditions. Gas management was required to operate under significant budget limitations, workforce levels were reduced, and gas safety programs were reduced in scope of effort and expenditures were often deferred until future years.

At the same time that cash flow commitments were being constrained to austerity levels, senior management compensation was not subjected to similar financial constraints.

Cash compensation (base salary and short-term incentive compensation) for named executive officers was generally targeted to compare to the median of other comparable companies, plus or minus 15%. The peer companies in the PG&E proxies may be similar in size, but they are generally more complex organizations with unregulated subsidiary operations, generation assets, and more complex structures, including centralized service company subsidiaries. Regardless of this distinction, senior officers more often than not received at or above their target pay, exceeding average compensation for the comparison group. The best example of PG&E officers earning significantly more than their peers happened in 2003. PG&E officers that year received a large payout from phantom restricted stock units that were granted in 2001 under the Senior Executive Retention Program. See attached compensation support.

Incentive compensation for named executive officers for PG&E and its proxy peer group for compensation did not include public safety factors for 2009 and 2010. PG&E introduced public and customer safety metrics in determining incentive compensation payouts for its executive officers in 2012. See attached compensation support.

Above industry average compensation to the PCG named executive officers contrasts with and occurred simultaneous with the periods of financial constraints on gas safety expenditures and a lack of emphasis on improving customer and public safety.

**See Compensation Support attached.** ←

| Mr. Lubow's testimony will be based upon the PG&E 10Ks and proxy statements provided with his disclosure. |
|---|

## Planning and budgeting

The budget process typically used in the utility industry begins with departmental managers assessing expected capital and operating needs, taking into account prior costs and known changes in operating conditions and capital projects. This departmental data is then input into a financial model to determine the utility's ability to cover these costs with internally generated funds from operations, and if not, what funding requirements must be considered. If external funding is required, projects that may result in lower earnings are often subject to further review.

However, regulated utilities are generally allowed to earn an authorized rate of return on capital expenditures, and are allowed to recover costs necessary to operate their properties in a safe and reliable manner. Therefore, safety related expenditures are rarely constrained in this process.



Discretionary funding is normally focused on growth opportunities or longer-term programs that may be funded over a period of time.

~~The PCG budget process tended to differ somewhat from this general industry approach. The gas business unit was often given quantitative and qualitative guidelines at the outset of the budget process, imposing financial constraints on what expenditures managers might deem necessary, and forcing inappropriate pressure on budget recommendations necessary to support safe and reliable service to customers.~~

- ~~PGE_DOJ-1171084; 1171134-152~~
- ~~PGE_DOJ-6758602-604~~

~~In its budget process, senior management set budget criteria to produce an Earnings Per Share target. Business Unit spending levels were set to be consistent with the targeted financial expectations. These financial targets were set as a priority over safety and reliability.~~

- ~~Distribution Report, p. 8-3~~
- ~~PG&E QBR#2 Kickoff dated June 1, 2009~~
- ~~PGE_DOJ_6759919 – PGE_DOJ_6759932~~

~~PCG managed capital and operations funding requirements at the corporate level. As such, the gas business unit competed directly with electric project funding and operating requirements. Further, when unforeseen costs were incurred, management would attempt to reduce costs from existing budget items or reallocate budgeted expenditures between gas and electric operations. In this process, gas safety was not given a high priority in the planning, budgeting and operations processes.~~

- ~~Bates Nos. USA 116286-289~~
- ~~Distribution Report, p. 8-4~~

~~Broadly, utilities do not reallocate budgeted funding of required safety related capex and operations requirements as a result of unforeseen events impacting expected costs. Rather, budget commitments are generally met, and the underlying causes of variances are considered in cash management and financing requirements. Unforeseen costs would generally result in somewhat lower earnings. For PGE, unbudgeted or unforeseen costs were addressed differently. Efforts were made to manage costs to a budget target, regardless of whether this resulted in underfunding necessary safety programs and operations.~~

- ~~Distribution Report, p. 5-20~~
- ~~October 16, 2003 E-Mail from Raymond Thierry to Numerous People (Subject: 2004 GPRP Targets)~~

**~~Requested vs. approved levels and related impacts – budgets reflect lack of funding for high-priority gas safety projects, leading to declines in system reliability~~**

~~In contrast to general industry practice, PGE was willing to treat priority safety projects and operating expenditures as discretionary, subject to obvious failures (as defined by company management) to comply with Code requirements.~~



- ~~PGE_DOJ-6758602-604~~
- ~~Bates No. USA 117698~~
- ~~Bates No. USA 116467~~
- ~~Bates No. USA 116416; 116481~~

~~Prior to San Bruno, the planning documents demonstrate a heavy emphasis on cost reduction and limiting actual spending to budgeted amounts. There is little discussion or emphasis on public safety. However, post San Bruno, there is a striking change in emphasis towards public safety and away from financial targets and cost reduction.~~

- ~~Distribution Report, pp. 9-10 to 9-11; and 13-11~~
- ~~Gas Operations: Operating Plan, 2012-2014: QBR 2 Submission~~

**~~See Planning and Budgeting Support attached.~~**

**~~PG&E constrained spending on maintenance and integrity management in the years just prior to the San Bruno Incident~~**

~~Management significantly reduced the expense funding requests made by Gas Transmission & Storage (GT&S) in 2008 and 2009 when approving the company's budget. In 2008, the maintenance expense request was reduced by $16.4 million to $51.4 million, which represented a 24 percent reduction. In the same year, management reduced integrity management expense by $7.2 million to $16.4 million. This represented a 30 percent reduction. In total, the approved budget for GT&S was $92.3 million versus a requested amount of $116.9 million. The 2008 approved budget was slightly more than the actual expenses incurred by the company in 2007.~~

~~In 2009, budget requests in total were also restricted although not to the same extent as 2008. The maintenance expense request was $60.4 million but was only approved for $54.0 million, an 11 percent reduction. The integrity management expense budget was actually approved at a level that was slightly higher than requested, $17.4 million versus $16.4 million. However, in total the budget approved for GT&S only amounted to $95.0 million compared to a $101.3 million request.~~
~~Documents relied include:~~

- ~~PGE_DOJ_1174614~~

**~~See Constrained Spending on Maintenance and Integrity Management Support attached.~~**

## ~~Spending Reduction Tactics~~

**~~Headcount Variances~~**

~~In an effort to reduce costs and increase profitability, PG&E made significant reductions in the headcount of gas distribution employees from 2,000 employees in 2002 to 1,787 the year of the San Bruno explosion in 2010. These headcounts are found in Overland Consulting's Focused Financial Audit of The Pacific Gas & Electric Company's Gas Distribution Operations. During this time of headcount reductions, PG&E's customer count increased from approximately 3.9 million in 2002 to 4.2 million in 2010, according to PG&E's FERC Form 2s, excerpts of which are found in the headcount variances support. The contrasting trends in gas distribution employees and gas customers for PG&E imply that there is a possibility of resource constraints in gas distribution operations.~~



~~Subsequent to the San Bruno explosion in 2010, it appears that PG&E made a concerted effort to increase employee headcount, particularly in the gas operations business. The Gas Operations 2012 to 2014 Operating Plan included large staffing increases. The Gas Operations headcount was forecasted to increase from 2,190 in 2009 to 2,660 in 2012. Furthermore, in PG&E's 2014 general rate case application, it stated that it plans to hire over 1,400 more people in the gas organization through 2014 to address various pipeline and safety issues.~~

**~~See Headcount Support attached.~~**

**~~The decision to switch from In-Line Inspection (ILI) to External Corrosion Direct Assessment (ECDA) to inspect pipelines was largely done to reduce costs~~**

~~The change from using ILI to inspect pipelines to using ECDA instead was characterized as a cost reduction initiative in PG&E's internal documentation. This change was made by management even though Gas Engineering strongly preferred that ILI be used because it was more thorough. ILI is superior to ECDA, as it can detect defects that ECDA cannot. PG&E made the switch to ECDA while the other large gas utility in the state of California continued to use ILI to inspect pipelines. Documents relied upon in reaching this conclusion included the following:~~

- ~~November 29, 2010 E-Mail from Frank Dauby to Sara Peralta (Subject: RE: CPUC IMP Letter – Exception Process)~~
- ~~USA 116862 – USA 116863; USA 116872~~
- ~~USA 117651 – USA 117681~~
- ~~PGE_DOJ_6760705 – PGE_DOJ_6760728~~
- ~~PGE_DOJ_6758602 – PGE_DOJ_6758603~~
- ~~PGE_DOJ_6758668 – PGE_DOJ_6758687~~

~~The NTSB found that of PG&E's 1,021 miles of high-consequence area pipelines, the company has designated 813 miles for direct assessment methodologies and only 208 miles for in-line inspection tools (p. 112).~~

**~~See Pipeline Assessment Support attached.~~**

**~~The change from the Gas Pipeline Replacement Program (GPRP) to the Risk Management Program (RMP) was also driven by cost considerations~~**

~~As with the switch from ILI to ECDA, the change from GPRP to the RMP was characterized as a cost reduction initiative internally, expected to save the company over $60 million over the life of the program. It was also intended to be used as a means to justify the use of integrity verification methods other than ILI (smart pigging). As such, it goes hand-in-hand with the ILI-to-ECDA switch previously mentioned. Documents relied upon in reaching this conclusion included the following:~~

- ~~PGE_DOJ_6758105 – PGE_DOJ_6758181~~
- ~~PGE_DOJ_6758417 – PGE_DOJ_6758460~~



 © 2024 Thomson Reuters. No claim to original U.S. Government Works. 

~~PG&E deferred costs to future years in order to meet financial goals even though system reliability and safety were understood to be negatively affected~~

~~When PG&E either needed to conserve cash or reduce expenses or capital expenditures, management would frequently postpone work to future years. Doing so repeatedly had a negative impact on system reliability, overall safety, and compliance with regulations. At times, management would acknowledge the consequences of its actions, but even in cases in which it did not, management should have had the foresight to realize that repeated deferrals of such costs placed the company at risk for system failures and potentially higher repair costs. In contrast to PG&E, when gas prices began to decline in more recent years, capital expenditures were actually accelerated to fund long-term projects such as pipe replacement programs. Documents relied upon in reaching this conclusion included the following:~~

- ~~PGE_DOJ_1171153 – PGE_DOJ_1171277~~
- ~~PGE_DOJ_6757010 – PGE_DOJ_6757031~~
- ~~PGE_DOJ_6758602 – PGE_DOJ_6758604~~
- ~~USA-117668 – USA-117669~~
- ~~PGE_DOJ_6757869 – PGE_DOJ_6757979~~

    - ~~Project Deferrals~~

~~PG&E Has Implemented Several Formal Austerity Programs over the Past Two Decades~~

~~In response to the California energy crisis and subsequent corporate bankruptcy and reorganization in the early 2000s, management took steps to conserve cash which ranged from employee lay-offs and hiring freezes to suspension of the payment of common and preferred stock dividends. More recently, stricter hiring controls, elimination of discretionary overtime, and elimination of non-mandatory routine leak repairs were some of the actions taken by PG&E management to offset expense increase in the 2008-2009 timeframe. A workforce reduction initiative completed in March 2010 reduced PG&E's total headcount by 2 percent (approximately 500 FTEs). Documents relied upon in reaching this conclusion included the following:~~

- ~~D.01-03-029~~
- ~~PGE_DOJ_6757869 – PGE_DOJ_6757979~~

    - ~~3,000 employees terminated in 1993, another 2,500 by 1995; cut O&M expense by 13%~~
    - ~~Cash conservation in 2000 to 2002 due to California Energy crises~~
    - ~~Even in period of financial stress, utilities are required to provide safe, adequate, and reliable service~~
    - ~~2009 company-wide workforce reduction program of about 500 employees~~

    ~~**See Austerity Programs Support attached.**~~

Financial Performance and Results

Aside from the adverse financial effects of the PG&E bankruptcy in 2001 brought about by the energy crisis in that timeframe, PG&E financial performance was been strong. Significantly, this was even true during the period of the US real estate and financial market crisis in the 2008 and 2009 timeframe.

Page 10 of 11

~~Up until the San Bruno incident, PGE corporate earnings averaged about $1.1 billion per year. Even in the years after the incident, net income remained in excess of $800 million.~~

~~During the period of 2002 to 2012, PG&E issued about $18 billion of long-term debt; averaging about $1.6 billion per year during this period. During this same period, the company's book equity rose over $8 billion. The equity ratio averaged 50%, generally in line, if not somewhat favorable to it's utility peers.~~

- ROE equal to or higher than authorized prior to San Bruno

~~Post San Bruno, PG&E returns on equity remained in excess of 6%; considered a very strong outcome, given the significant impact of California regulatory actions, fines, and penalties.~~

~~Subsequent to the impact of the bankruptcy on the PGE credit ratings, PG&E returned to institutional grade ratings on its issuer and debt securities. Since 2005, these ratings have been at or better than electric utility averages. The Moody's ratings have stable through the 2008 financial crisis and the San Bruno incident.~~

A HIGHER RATE OF EARNINGS WOULD HAVE

~~In this financial environment, PCG and PG&E had the financial capacity to fund gas transmission and distribution capital and operations costs necessary to assure public safety and reliability, but chose not to do so. Instead, PG&E diverted Commission approved revenues from their intended purpose to other corporate financial objectives; namely to improve cash flow and earnings results. As else equal, these practices had the net effect of increasing shareholder returns and enhanced the compensation payments to the PCG senior officers.~~

~~Dividends are a component of benefits shareholders receive. During the study period, PCG paid dividends generally at or above its industry peers.~~ PCG dividend levels were not reduced in the 2008 to 2010 timeframe. ~~The funds required to support dividends to shareholders were in the range of $450 million in 2006 to $750 million in 2012.~~

Reported

- ~~Overland PUC studies indicated that~~ PGE revenues were ~~about $400 million~~ over authorized levels needed to earn authorized returns

    **See Financial Performance and Results Support attached.**

Mr. Lubow's testimony will be based upon the PG&E 10Ks and proxy statements provided with his disclosure.

Page 11 of 11

## All Citations

Not Reported in Fed. Supp., 2016 WL 1640462

## Footnotes

1 PG&E also moved to exclude the testimony of witnesses Steve Nanney and Margaret Felts. A hearing on Mr. Nanney is forthcoming, and a separate order regarding his testimony will be issued following that hearing. The Government has since withdrawn Ms. Felts as a witness, Apr. 12, 2016 Tr. at 3 (Dkt. No. 436), so the Court need not address the parties' arguments regarding her proposed testimony.

**End of Document**

© 2024 Thomson Reuters. No claim to original U.S. Government Works.