**FILED**

MAR 06 2024

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                    DEPUTY CLERK

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF TEXAS
# MIDLAND/ODESSA DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                     Plaintiff,<br><br>      v.<br><br><br>AGHORN OPERATING, INC.,<br>TRENT DAY, and KODIAK<br>ROUSTABOUT, INC.,<br>                  Defendants. | <u>**SUPERSEDING INDICTMENT**</u><br><br>NO. 7:22-CR-00049-DC<br><br>[Vio: 42 U.S.C. § 7413(c)(1)-Clean Air Act;<br>42 U.S.C. § 7413(c)(5)(A)-Clean Air Act; 29<br>U.S.C. § 666(e)-OSH Act; 18 U.S.C. § 1505-<br>Obstruction; 42 U.S.C. § 300h-2(b)-Safe<br>Drinking Water Act; 18 U.S.C. § 1001-False<br>Statements; 18 U.S.C. § 371-Conspiracy; 18<br>U.S.C. § 2-Aiding and Abetting)]<br><br>Notice of Government's Demand for<br>Forfeiture |

THE GRAND JURY CHARGES:

All times relevant to this Superseding Indictment:

## INTRODUCTION

1.  Defendant Aghorn Operating, Inc. ("Aghorn"), was incorporated in Texas, and had a principal office in Odessa, Texas. Aghorn was in the oil and gas industry and owned and operated oil wells and leases in Texas.

2.  Defendant Trent Day was a chemical engineer and the Vice President of Aghorn. Day supervised all Aghorn field operations and employees. Day, whose supervisory duties included hiring and disciplining employees, making major expenditures, and reviewing and approving invoices, maintenance, worker safety, and regulatory compliance, was an operator of Aghorn oil wells and leases.

3.  Defendant Kodiak Roustabout, Inc. ("Kodiak"), was incorporated in Texas, and had a principal office in Odessa, Texas. Kodiak performed oilfield support and maintenance

services for Aghorn. Defendant Trent Day was the Vice President of Kodiak, and supervised Kodiak operations.

## LEGAL BACKGROUND

### The Clean Air Act

4.      The Clean Air Act, 42 U.S.C. § 7401 et seq., is the Nation's comprehensive air pollution control statute, and includes provisions designed "to protect and enhance the quality of the Nation's air resources." 42 U.S.C. § 7401(b)(1).

5.      Section 112(r) of the Clean Air Act contains provisions to prevent the accidental release of regulated and extremely hazardous substances. 42 U.S.C. § 7412(r)(1). This section imposes a general duty on owners and operators of stationary sources producing, processing, handling, or storing extremely hazardous substances. The general duty requires such owners and operators (1) to identify hazards that may result from such releases using appropriate hazard assessment techniques, (2) to design and maintain a safe facility taking such steps as are necessary to prevent releases, and (3) to minimize the consequences of accidental releases that do occur. 42 U.S.C. § 7412(r)(l). "The term 'stationary source' means any buildings, structures, equipment, installations, or substance emitting stationary activities (i) which belong to the same industrial group, (ii) which are located on one or more contiguous properties, (iii) which are under the control of the same person (or persons under common control), and (iv) from which an accidental release may occur." 42 U.S.C. § 7412(r)(2)(C).

6.      Hydrogen sulfide is an extremely hazardous substance. Congress specifically identified hydrogen sulfide as a substance the release of which is known to cause or may be reasonably anticipated to cause death, injury, or serious adverse effects to human health or the

environment. 42 U.S.C. § 7412(r)(3); 40 C.F.R. § 68.130 at Tables 1 and 2; 42 U.S.C. § 11002(a)(2); 40 C.F.R. Part 355 at Appendix A.

7.      Under the Clean Air Act any person who knowingly violates the general duty imposed by 42 U.S.C. § 7412(r)(1) has committed a crime. 42 U.S.C. § 7413(c)(1). Any person who knowingly releases into the ambient air any extremely hazardous substance, and who knows at the time that he thereby places another person in imminent danger of death or serious bodily injury, has committed a crime. 42 U.S.C. § 7413(c)(5)(A).

## The Occupational Safety and Health Act

8.      The United States Department of Labor ("DOL"), a department and agency of the executive branch of the United States Government, is responsible for the enforcement of the laws of the United States in the area of labor and employment conditions, including the Occupational Safety and Health Act of 1970 ("OSH Act"), 29 U.S.C. § 651 et seq. The OSH Act was designed to assure safe and healthful working conditions.

9.      The Occupational Safety and Health Administration ("OSHA"), an agency of the DOL, is responsible for administering the OSH Act through the promulgation and enforcement of safety and health regulations covering federal and private sector workers throughout the United States.

10.      Defendant Aghorn, as an entity engaged in the oil and gas industry, was subject to the OSH Act and was obligated to comply with all relevant safety and health regulations promulgated by OSHA. Defendant Aghorn was an "employer" under the OSH Act.

11.      An employer is required to protect employees from the harmful effects of hydrogen sulfide and OSHA has set an acceptable ceiling concentration of 20 ppm and a "maximum peak above the acceptable ceiling concentration" of 50 ppm. 29 C.F.R. § 1910.1000(b) and (e) (Table

Z-2). An employer must determine and implement feasible administrative or engineering controls to ensure employees are not exposed to hydrogen sulfide above certain limits. 29 C.F.R. § 1910.1000(e). An employer is also required to establish and implement a written respiratory protection program that includes the provisions of 29 C.F.R. § 1910.134(c)(1)(i)-(ix).

12.     OSHA is empowered to conduct investigations into violations of worker safety standards, and issue citations and penalties for those violations. 29 U.S.C. §§ 657-59.

### The Safe Drinking Water Act

13.     In 1974, Congress passed the Safe Drinking Water Act ("SDWA") to ensure that the water delivered by public water systems is safe. 42 U.S.C. §§ 300f to 300j-27. The SDWA regulates certain underground injections of materials beneath the land's surface. 42 U.S.C. § 300h(d).

14.     "Injection wells"—the wells regulated by the SDWA—are those wells "into which 'fluids' are being injected." 40 C.F.R. § 144.3. The United States Environmental Protection Agency ("EPA") has defined five classes of injection wells, with Class II wells receiving certain injected fluids related to oil and natural gas production. 40 C.F.R. § 144.6(b).

15.     Under the SDWA, states are the primary enforcers of the Underground Injection Control ("UIC") program. Once a state program meets minimum federal standards, it may secure primary enforcement authority for the regulation of underground water sources if the EPA approves the state's UIC program. 42 U.S.C. § 300h-4(c)(2). Texas has an EPA-approved UIC plan, administered by the Texas Railroad Commission ("RRC"). 40 C.F.R. § 147.2201.

16.     When a state obtains primary enforcement authority, the federal government retains enforcement authority, including the right to initiate criminal charges for violations of the SDWA.

4

It is a crime under the SDWA for a person to willfully violate any requirement of an applicable UIC program. 42 U.S.C. § 300h-2.

17.     Any person in the State of Texas who engages in fluid injection operations in reservoirs productive of oil must obtain a permit from the RRC. 16 T.A.C. § 3.46(a). The mechanical integrity of an injection well must be evaluated by conducting pressure tests or alternative testing methods approved by the RRC. 16 T.A.C. § 3.46(j)(1).

18.     In evaluating the results of a pressure test, the RRC considers "the level of pollution risk that loss of well integrity would cause." 16 T.A.C. § 3.46(j)(4)(G). A pressure test may be rejected by the RRC "after consideration of the following factors: (i) the degree of pressure change during the test, if any; (ii) the level of risk to usable-quality water if mechanical integrity of the well is lost; and (iii) whether circumstances surrounding the administration of the test make the test inconclusive." Id.

## FACTUAL BACKGROUND

### The Foster "D" Station

19.     "Produced water" is an oil well wastewater that contains a mixture of water, salts, and residual hydrocarbons. It can contain hydrogen sulfide, also known as "H2S." According to the National Institute for Occupational Safety and Health, hydrogen sulfide is an acute toxic substance that is a leading cause of sudden death in the workplace and is especially toxic when it occurs in low-lying areas, confined spaces, or in high concentrations under pressure.

20.     "Water flooding" is a petroleum extraction technique that uses produced water to recover additional oil from mature oil fields. Produced water is injected into a formation in order to drive crude oil out of the ground.

21.     Aghorn operated a water flood station named the Foster "D," Section 8 Waterflood Station, located at 2216 W. 49th Street in Odessa, Texas (the "Station"). The Station received produced water from various adjacent oil producing leases and injected it as part of an oil recovery project that has been in operation since 1974.

22.     The produced water traveled from the oil leases to a header, was pumped into a 3,000-barrel suction tank, and then moved through a suction line into injection pumps, where it was pressurized and sent out of the Station via an injection header, to be delivered to various injection wells tied to the system. Oil entrained in the produced water was separated from the produced water and ultimately recovered. Gas entrained in the produced water was to be drawn out of the suction tank with a vapor recovery unit and sent down the sales line or to the flare located at the north end of the facility.

23.     Aghorn was aware that its produced water contained high amounts of H2S as well as the deadly nature of the gas. In 2003, the company prepared a contingency plan "to alert and protect the public" in the event of an H2S leak and described approximately 1200 wells "with various concentrations of hydrogen sulfide" located in residential and publicly accessible areas such as public roadways. The company attached a Data Sheet to the plan describing H2S as "[e]xtremely hazardous" and capable of causing "immediate death" at very high concentrations. On January 10, 2012, Aghorn wrote to the RRC that the hydrogen sulfide concentration of its produced water was 96,000 ppm.

24.     Defendant Trent Day was familiar with the Foster "D" Station, having supervised the operation and served as a relief pumper at the facility.

6

## The Deaths of Jacob and Natalee Dean

25.     On October 26, 2019, at approximately 6:51 p.m., Jacob Dean, an employee of Aghorn, responded to a call to check the pump house, an enclosed building with two bay doors at the Station. His wife, Natalee Dean, knew where Jacob had gone, and started calling him when he did not return in a timely manner. When those calls went unanswered, Natalee drove to the Station with her two children, aged nine and six, arriving at approximately 9:30 p.m.

26.     A pump had failed in the pump house, causing a leak of produced water containing H2S. Jacob had been overcome by H2S in the pump house, and when Natalee arrived at the Station, she exited the vehicle and proceeded to the pump house, where she too was overcome by the gas. Both Jacob and Natalee were found dead by the first responders to the scene.

27.     The Odessa Fire Department and the Ector County Sheriff's Office responded to the scene on October 26, 2019. Both bay doors of the pump house were open and dangerously elevated levels of H2S were detected. When the bodies of Jacob and Natalee Dean were transported to a staging area approximately 300 yards south of the pump house, the H2S readings on Fire Department gas monitors increased.

28.     The Station had eight stationary H2S monitors that were designed, in the event of an H2S release, to display on a control panel and activate a light at the top of the pump house. On the night of October 26, 2019, none of the monitors were operable and readable at the control panel, and thus they did not trigger the light on top of the pump house to warn Jacob or Natalee Dean of the toxic level of H2S in the pump house.

29.     On the night of October 26, 2019, an Aghorn representative advised the Sheriff's Office that "the field had been shut in and there was no longer any product flowing." However, when Fire Department and law enforcement officials returned to the site the next day on October

7

27, 2019, they observed produced water leaking from the pump in the pump house and again detected elevated H2S readings outside the pump house bay doors, with a reading outside one of the bay doors of 150 ppm. The Fire Department then shut off the main suction line leading into the building, which succeeded in stopping the leak. When they returned to the site the following day, October 28, 2019, they detected a zero reading for H2S.

## The OSHA Investigation

30.     OSHA began an investigation on October 28, 2019, two days after the Dean fatalities. On that day, an OSHA inspector conducted an inspection of the Station. The OSHA investigation included document review and employee interviews, including interviews of Trent Day on October 28, 2019, and April 6, 2020.

## The Well Pressure Tests

31.     Aghorn operated numerous produced water injection wells and submitted purported well pressure test results to the RRC. Typically, the submittals consisted of a completed RRC "Form H-5" from Aghorn, with a pressure recording chart attached. The Form H-5 was signed by an Aghorn "Regulatory Analyst" along with a "Certificate" stating:

> I declare under penalties prescribed in Sec. 91.143, Texas Natural Resources Code, that I am authorized to make this report, that this report was prepared by me or under my supervision and direction, and that data and facts stated herein are true, correct and complete, to the best of my knowledge.

32.     The pressure recording charts attached to the Form H-5s were marked "Kodiak Roustabout, Inc.," identified the company for which the test was completed as "Aghorn Operating," and were signed by Trent Day, who was identified as "CO. MAN." Kodiak, which performed oilfield support and maintenance services for Aghorn, was tasked to conduct the pressure tests by Trent Day.

8

**Common Plan or Scheme**

33.     The Grand Jury charges in this Superseding Indictment various types of conduct to include charges relating to the control of H2S and failure to conduct well pressure tests. The charges in this Indictment constitute a common plan or scheme by the Defendants to enrich themselves by maximizing the production of oil at Aghorn while minimizing costs, without concern for environmental pollution and worker safety risks, and to ensure that this activity was not discovered by regulators.

## COUNT ONE

### Clean Air Act – General Duty Clause

34.     Paragraphs 1-2, 4-7, 19-29, and 33 above are hereby realleged and incorporated by reference as if fully set forth herein.

35.     On various dates, including between in or about April 2017 to on or about October 26, 2019, in the Western District of Texas and elsewhere, the Defendants,

AGHORN OPERATING, INC., and TRENT DAY,

as owners and operators of a stationary source producing, processing, handling, and storing an extremely hazardous substance, to wit: hydrogen sulfide, knowingly violated their general duty to prevent the accidental release of the extremely hazardous substance into the ambient air from the stationary source, by failing to design and maintain a safe facility, to take such steps as are necessary to prevent releases, and to minimize the consequences of accidental releases which do occur.

A violation of Title 42, United States Code, Sections 7412(r)(l) and 7413(c)(1), and Title 18, United States Code, Section 2.

9

## COUNT TWO

### Clean Air Act – Knowing Endangerment

36.     Paragraphs 1-2, 4-7, 19-29, and 33 above are hereby realleged and incorporated by reference as if fully set forth herein.

37.     On various dates, including between in or about April 2017 to on or about October 26, 2019, in the Western District of Texas and elsewhere, the Defendants,

AGHORN OPERATING, INC., and TRENT DAY,

knowingly released into the ambient air an extremely hazardous substance, to wit: hydrogen sulfide, and knew at the time that they thereby placed another person in imminent danger of death or serious bodily injury.

A violation of Title 42, United States Code, Section 7413(c)(5), and Title 18, United States Code, Section 2.

## COUNT THREE

### OSH Act – Willful Violation Causing Death to Employee

38.     Paragraphs 1, 8-12, 19-29, and 33 above are hereby realleged and incorporated by reference as if fully set forth herein.

39.     On or about October 26, 2019, in the Western District of Texas and elsewhere, the Defendant,

AGHORN OPERATING, INC.,

did willfully violate 29 C.F.R. § 1910.1000(b)(2), a regulation prescribed pursuant to the OSH Act, and that violation caused death to an employee, to wit: the Defendant exposed an employee to hydrogen sulfide in excess of the peak concentration of 50 ppm, and thereby caused the death of employee Jacob Dean.

10

A violation of Title 29, United States Code, Section 666(e), and Title 18, United States Code, Section 2.

## COUNT FOUR

### OSH Act – Willful Violation Causing Death to Employee

40.     Paragraphs 1, 8-12 19-29, and 33 above are hereby realleged and incorporated by reference as if fully set forth herein.

41.     On or about October 26, 2019, in the Western District of Texas and elsewhere, the Defendant,

AGHORN OPERATING, INC.,

did willfully violate 29 C.F.R. § 1910.1000(e), a regulation prescribed pursuant to the OSH Act, and that violation caused death to an employee, to wit: the Defendant did not determine and implement feasible administrative and engineering controls to achieve compliance with the exposure limits for hydrogen sulfide prescribed in 29 C.F.R. § 1910.1000(b), and thereby caused the death of employee Jacob Dean.

A violation of Title 29, United States Code, Section 666(e), and Title 18, United States Code, Section 2.

## COUNT FIVE

### OSH Act – Willful Violation Causing Death to Employee

42.     Paragraphs 1, 8-12, 19-29, and 33 above are hereby realleged and incorporated by reference as if fully set forth herein.

43.     On or about October 26, 2019, in the Western District of Texas and elsewhere, the Defendant,

AGHORN OPERATING, INC.,

did willfully violate 29 C.F.R. § 1910.134(c)(1), a regulation prescribed pursuant to the OSH Act, and that violation caused death to an employee, to wit: the Defendant did not establish and implement a written respiratory protection program that included the provisions of 29 C.F.R. § 1910.134(c)(1)(i)-(ix), and thereby caused the death of employee Jacob Dean.

A violation of Title 29, United States Code, Section 666(e), and Title 18, United States Code, Section 2.

## COUNT SIX

### Obstruction of OSHA Proceeding

44.     Paragraphs 1-2, 8-12, 19-30, and 33 above are hereby realleged and incorporated by reference as if fully set forth herein.

45.     On or about October 28, 2019, in the Western District of Texas and elsewhere, the Defendants,

AGHORN OPERATING, INC., and TRENT DAY,

did corruptly obstruct, impede, and endeavor to obstruct and impede, the due and proper administration of the law under which a pending proceeding was being had before the Occupational Safety and Health Administration, an agency of the United States; that is, Trent Day, acting individually and within the scope of his agency and employment for Aghorn Operating, Inc., and at least in part for the benefit thereof, falsely stated in substance in an interview with OSHA that, regarding stationary H2S monitors at the Station: (1) they were calibrated, including that "calibration [was] done every 90 days," and the "sensors" were "calibrated;" (2) "if one of the sensors senses the reading of 10 ppm, you get a call for H2S. Whoever is program[ed] into the call out system;" and (3) "an alarm at 10 ppm [of H2S] triggers an alarm."

12

A violation of Title 18, United States Code, Sections 1505 and 2.

## COUNT SEVEN

### Obstruction of OSHA Proceeding

46.     Paragraphs 1-2, 8-12, 19-30, and 33 above are hereby realleged and incorporated by reference as if fully set forth herein.

47.     On or about April 6, 2020, in the Western District of Texas and elsewhere, the Defendants,

AGHORN OPERATING, INC., and TRENT DAY,

did corruptly obstruct, impede, and endeavor to obstruct and impede, the due and proper administration of the law under which a pending proceeding was being had before the Occupational Safety and Health Administration, an agency of the United States; that is, Trent Day, individually and acting within the scope of his agency and employment for Aghorn Operating, Inc., and at least in part for the benefit thereof, falsely stated in substance in an interview with OSHA, regarding self-contained breathing apparatuses, that prior to October 26, 2019 a "fitting test" was conducted where "everybody brought their gear in," stating in substance:

> We have fit testing training, prior to the accident we had H2S, fitting test, everybody brought their gear in, it was tested. H2S awareness training and equipment maintenance.

A violation of Title 18, United States Code, Sections 1505 and 2.

## COUNT EIGHT

### The Safe Drinking Water Act

48.     Paragraphs 1-3, 13-18, and 31-33 above are hereby realleged and incorporated by reference as if fully set forth herein.

13

49.     On various dates from in or about July 2017 to in or about September 2019, in the Western District of Texas and elsewhere, the Defendants,

AGHORN OPERATING, INC., TRENT DAY, and KODIAK ROUSTABOUT, INC.,

did willfully fail to evaluate the mechanical integrity of an injection well by not conducting pressure tests and alternative testing methods approved by the RRC, in that the Defendants failed to conduct pressure tests at Aghorn Operating, Inc. leases in violation of 16 T.A.C. § 3.46(j)(1), which is a regulation that is part of an EPA-approved UIC plan.

A violation of Title 42, United States Code, Section 300h-2, and Title 18, United States Code, Section 2.

## COUNT NINE

### False Statements

50.     Paragraphs 1-3, 13-18, and 31-33 above are hereby realleged and incorporated by reference as if fully set forth herein.

51.     On various dates from in or about July 2017 to in or about October 2019, in the Western District of Texas and elsewhere, the Defendants,

AGHORN OPERATING, INC., TRENT DAY, and KODIAK ROUSTABOUT, INC.,

in a matter within the jurisdiction of the Environmental Protection Agency, an agency of the executive branch of the government of the United States, did knowingly and willfully make materially false, fictitious, and fraudulent statements and representations and make and use a false writing and document knowing the same to contain a materially false, fictitious, and fraudulent statement and entry:

(a) in "Form H-5s" submitted by Aghorn Operating, Inc., to the RRC signed by an Aghorn agent along with a "Certificate" stating:

14

> I declare under penalties prescribed in Sec. 91.143, Texas Natural Resources Code, that I am authorized to make this report, that this report was prepared by me or under my supervision and direction, and that data and facts stated herein are true, correct and complete, to the best of my knowledge.

In truth and in fact, as Defendants then well knew and believed, the pressure tests had not been conducted on the wells and the data and facts were not true, correct, and complete; and

(b) by submitting to the RRC false pressure recording charts containing false statements and representations regarding pressure tests.

A violation of Title 18, United States Code, Sections 1001 and 2.

## COUNT TEN

### Conspiracy

52.     Paragraphs 1-29, and 31-32 above are hereby realleged and incorporated by reference as if fully set forth herein.

### Introductory Allegations

### Maintaining a Safe Facility and Preventing Releases of Hydrogen Sulfide

53.     H2S has a strong odor similar to rotten eggs, and gas containing H2S produced from oil and gas wells is known as "sour gas." The Permian Basin in West Texas produces significant amounts of sour gas.

54.     Defendant Aghorn owned and operated oil and gas leases throughout West Texas ("Aghorn leases"). Wells and other oil and gas facilities located on the Aghorn leases were stationary sources of sour gas.

55.     Many of Aghorn's operations and facilities, including wells, tank batteries, pump houses, and oil and gas lines, were located in areas of medium to dense populations, near homes, schools and commercial properties, or were near public roads and highways.

15

56.    Defendant Aghorn purchased existing wells on the Aghorn leases with equipment already in place, rather than drill new wells and install new equipment. The equipment associated with the Aghorn leases was often aging and in poor condition or disrepair, and safe operation and maintenance of the facilities were especially important to prevent releases of H2S.

57.    Defendant Trent Day, as Vice President of Defendants Aghorn and Kodiak, was responsible for the safe operation of the facilities on the Aghorn leases, including taking steps necessary to prevent releases of H2S and to minimize the consequences of any accidental releases that did occur.

58.    Well-established engineering and administrative controls were available to reduce the risk of exposure to H2S. Steps to design and maintain safe facilities, prevent releases of H2S, and minimize the consequences of accidental releases, included, among other things, that pumps, tanks and other equipment be properly maintained; ventilation be provided for enclosed buildings where H2S may be accidentally released; warning signs be posted about the existence of a potential H2S hazard; safety procedures be designed and established to prevent undetected releases of H2S; stationary H2S monitoring devices be installed and maintained; personal monitoring devices be provided; a written respiratory protection plan be implemented; employees be issued respiratory protection equipment; and site security measures be implemented to restrict public access.

59.    Relevant standards for the design, operation and maintenance of safe oil and gas facilities, the prevention of H2S releases from those facilities, and minimizing the consequences of accidental releases, were found in regulations of the RRC and in guidance of the American Petroleum Institute. *E.g.*, 16 T.A.C. § 3.36; Recommended Practice for Oil and Gas Producing and Gas Processing Plant Operations Involving Hydrogen Sulfide, API Recommended Practice 55 (2nd ed. Feb. 1995, reaff'd Jan. 2013).

60.     RRC regulations recognized the need to "provide safeguards to protect the general public from the harmful effects of hydrogen sulfide" and "install safety devices and maintain them in an operable condition" or "establish safety procedures designed to prevent the undetected continuing escape of hydrogen sulfide." 16 T.A.C. § 3.36(a) and (c)(8). Flaring of oilfield gases was one commonly used safeguard to protect the general public from the harmful effects of hydrogen sulfide, and was designed, in part, to convert highly toxic H2S into less toxic compounds.

61.     During the time period of the conspiracy, Aghorn facilities on Aghorn leases chronically released H2S, including releases at elevated levels that adversely affected human health.

### Maintaining Well Integrity

62.     Because Aghorn injected fluids into wells in connection with production of oil and gas, the wells were Class II injection wells under the SDWA and the EPA-approved UIC program of the RRC. 40 C.F.R. § 144.6(b). To comply with the UIC program, Aghorn was required, among other things, periodically to test the Aghorn wells to ensure well integrity and that the fluids it injected were not escaping from the wells and contaminating the environment and groundwater. Trent Day was responsible for conducting and overseeing the conduct of the tests of the Aghorn wells on behalf of Aghorn and Kodiak to satisfy these requirements.

63.     The well integrity of the Aghorn wells was to be determined using pressure tests of the wells. Valid pressure tests were performed by closing in the well, increasing the pressure within the well and measuring whether the well held the pressure. If the pressure dropped significantly, or there was significant fluid movement, that would show that materials were leaking from the well and the well lacked integrity. To properly perform a pressure test of an Aghorn well, the pressure of the well had to be measured at the well itself.

17

64.     Some Aghorn wells lacked well integrity and leaked.

<u>The Conspiracy</u>

65.     From no later than in or about 2009 and continuing to in or about 2024, in the Western District of Texas and elsewhere, the Defendants,

AGHORN OPERATING, INC., KODIAK ROUSTABOUT, INC., and TRENT DAY,

did knowingly conspire and agree with each other, and with others known and unknown to the Grand Jury, including Aghorn and Kodiak employees, to commit the following offenses against the United States:

(1) as owners and operators of stationary sources producing, processing, handling, and storing an extremely hazardous substance, to wit, hydrogen sulfide, to knowingly violate their general duty to prevent the accidental release of hydrogen sulfide into the ambient air from the stationary sources, by failing to design and maintain safe facilities, take such steps as are necessary to prevent releases, and minimize the consequences of accidental releases, in violation of Title 42, United States Code, Sections 7412(r)(1) and 7413(c)(1);

(2) to willfully fail to evaluate the mechanical integrity of injection wells by not conducting pressure tests and alternative testing methods approved by the RRC at Aghorn leases, in violation of Title 42, United States Code, Section 300h-2 and the UIC plan approved by the EPA; and

(3) in a matter within the jurisdiction of the EPA, an agency of the executive branch of the government of the United States, to knowingly and willfully make materially false, fictitious, and fraudulent statements and representations, and to make and use false writings and documents knowing the same to contain materially false, fictitious, and

fraudulent statements and entries, by submitting to the RRC Forms H-5 and pressure recording charts indicating that pressure tests had been performed on Aghorn wells and the wells had passed, when, in fact, tests had not been performed on the wells, in violation of Title 18, United States Code, Section 1001.

### Object of the Conspiracy

66.     The object of the conspiracy was to unjustly enrich Defendants by maximizing the production of oil and profits while avoiding expenses necessary to comply with environmental laws and safeguard human health, and to place operational convenience at Aghorn facilities above human health, safety, and the environment.

### Means and Methods

### Defendants and their Co-conspirators Failed to Maintain Safe Facilities and Prevent Releases of Hydrogen Sulfide

67.     It was part of the conspiracy that, at the Station and at other Aghorn leases, Defendants Aghorn, Kodiak and Trent Day, and other Aghorn and Kodiak employees, failed to take necessary steps to design and maintain safe facilities, prevent releases of H2S, and minimize the consequences of releases that did occur.

68.     It was further part of the conspiracy that, despite the propensity for malfunctions, frequent upsets and component failures on the aging Aghorn leases, Defendants Aghorn, Kodiak, and Trent Day, and other Aghorn and Kodiak employees, failed to properly maintain Aghorn facilities, including pumps, flares, tanks, hatches and other equipment, causing some of the facilities to fall into greater disrepair and resulting in H2S releases.

69.     It was further part of the conspiracy that Defendants Aghorn, Kodiak, and Trent Day, and other Aghorn and Kodiak employees, at one or more Aghorn facilities, failed to provide

19

adequate ventilation for an enclosed building where H2S may be accidentally released, failed to post and maintain visible warning signs about the existence of a potential H2S hazard, failed to design and establish safety procedures to prevent undetected releases of H2S, failed to install and maintain working stationary H2S monitoring devices, failed to implement a written respiratory protection plan, failed to provide employees with adequate respiratory protection equipment, and failed to provide site security and prevent public access.

70.    It was further part of the conspiracy that Defendants Aghorn, Kodiak, and Trent Day, and other Aghorn and Kodiak employees regularly released or "vented" H2S as an accepted way of operating at some Aghorn facilities, by failing to light flares or repair non-functioning flares, or by failing to prevent or repair leaks in tanks, tank hatches or other Aghorn equipment.

71.    It was further part of the conspiracy that Defendants Aghorn, Kodiak, and Trent Day, and other Aghorn and Kodiak employees, failed to establish or follow Aghorn's own policies and procedures, and failed to follow accepted industry practices and standards, and regulations of the State of Texas, designed to maintain safe facilities and protect workers and the general public from the harmful effects of hydrogen sulfide releases.

Defendants and their Co-conspirators Falsified Tests Intended to Maintain Well Integrity

72.    It was further part of the conspiracy that Defendants Aghorn, Kodiak, and Trent Day, and other Aghorn and Kodiak employees acting under Day's direction, did not perform required pressure tests on Aghorn wells, to save the costs of performing the tests, conceal wells that were compromised and leaking, and save the costs of repairing compromised wells, and instead Defendants Aghorn, Kodiak and Day, and other Aghorn and Kodiak employees, submitted

fraudulent test documentation to the RRC that falsely represented that the wells had been pressure tested and passed the tests, when in fact the wells were not tested.

Overt Acts

73.    In furtherance of the conspiracy and in order to effect the objects thereof, Defendants Aghorn Operating, Inc., Kodiak Roustabout, Inc., and Trent Day, and their co-conspirators committed and caused to be committed the following overt acts in the Western District of Texas:

**Overt Act Number 1**: In or about 2009, Defendant Trent Day instructed Co-conspirator 1, an employee of Aghorn, to "spin extra" recording charts from wells that passed pressure tests so that the fraudulent charts could be submitted to the RRC for wells that failed pressure tests.

**Overt Act Number 2**:  Beginning in or about 2009, at Defendant Trent Day's direction, Co-conspirator 1 generated multiple pressure recording charts from wells that passed pressure tests so that the fraudulent charts could be submitted to the RRC for wells that failed pressure tests.

**Overt Act Number 3**: On various dates from in or about 2010 to in or about 2012, Defendant Trent Day directed Co-conspirator 2, an employee of Aghorn, to make additional recording charts from wells that passed pressure tests so that the fraudulent charts could be submitted to the RRC for wells that failed pressure tests.

**Overt Act Number 4**: On various dates from in or about 2010 to in or about 2012, at Defendant Trent Day's direction, Co-conspirator 2 generated multiple pressure recording charts from wells that passed pressure tests and then worked with Trent Day to falsify those pressure recording charts to reflect that they were generated at other Aghorn wells.

**Overt Act Number 5**: At various times during the period of the conspiracy, to include in or about 2011 to 2017, Defendants Aghorn, Kodiak, and Trent Day, and their co-conspirators, including

21

Co-conspirator 1, caused H2S gas to be released from an unlit flare stack at the Foster D Tank Battery.

**Overt Act Number 6:** In or about 2018, Defendant Trent Day told Co-conspirator 1 not to worry about maintaining the stationary H2S monitors at the Aghorn Foster C lease.

**Overt Act Number 7**: In or about 2018, Defendant Trent Day ordered Co-conspirator 4, an employee of Aghorn, to make additional recording charts from wells that passed pressure tests so that the fraudulent charts could be submitted to the RRC for wells that failed pressure tests.

**Overt Act Number 8**: Starting in or about 2018, at Defendant Trent Day's direction, Co-conspirator 4 generated multiple pressure recording charts from wells that passed pressure tests, so that the fraudulent charts could be submitted to the RRC for wells that failed pressure tests.

**Overt Act Number 9**: From at least on or about September 17, 2018, to at least on or about August 19, 2021, each date listed below constituting a separate overt act, despite repeated inspections and notifications by the RRC to stop releases of H2S for safety reasons from Aghorn's facilities at its J.E. Bagley lease, Defendants Aghorn, Kodiak, and Trent Day, and their co-conspirators, continued to cause H2S to be released from that lease:

| | |
|---|---|
| a. | September 17, 2018 |
| b. | September 20, 2018 |
| c. | January 29, 2019 |
| d. | August 30, 2019 |
| e. | September 22, 2020 |
| f. | August 19, 2021 |

**Overt Act Number 10**: At various times during the period of the conspiracy, each one constituting a separate overt act, Defendants Aghorn, Kodiak, and Trent Day, and their co-conspirators, caused H2S gas to be released from Aghorn facilities on leases other than the J.E. Bagley lease, including but not limited to:

|     | Date On or About | Aghorn Lease or Location |
| --- | --- | --- |
| a. | Various times during the conspiracy | Cowden I lease |
| b. | Various times during the conspiracy | Gist et al Lease Well #2 |
| c. | 2013 | Yarbrough & Allen lease |
| d. | Various times from in or about 2011 to in or about 2017, including on or about September 18, 2013 | Foster D Tank Battery |
| e. | 2015-16 | Gist A lease |
| f. | 2015-16 | Gist B lease |
| g. | 2015-16 | Gist C lease |
| h. | 2015-16 | Emmons Unit lease |
| i. | 2015-17 | Foster D Tank Battery |
| j. | December 17, 2015 | Foster D Station |
| k. | June 16, 2017 | Gist Unit lease |
| l. | April 6, 2018 | Gist Unit lease |
| m. | September 5, 2018 | Foster D Station |
| n. | December 15, 2018 | Gist Unit lease |
| o. | October 26, 2019 | Foster D Station |
| p. | October 27, 2019 | Foster D Station |
| q. | November 1, 2019 | Foster Johnson Unit Well #18-18 |

| r. | November 14, 2019 | Gist Unit Well #95 |
|----|----|----|
| s. | 2019-2020 | Gist A Wells #10 and #21 |
| t. | March 2020 | Gist A lease |
| u. | March 2020 | Gist B and C leases |
| v. | July 22, 2020 | East Harper Unit lease |
| w. | July 22, 2020 | Gist A lease |
| x. | September 8, 2020 | Moss lease |
| y. | September 22, 2020 | Gist A lease |
| z. | May 14, 2021 | Cowden 1 lease |
| aa. | May 14, 2021 | Cowden 12 lease |
| bb. | May 14, 2021 | Cowden 13 lease |
| cc. | May 14, 2021 | Cowden 14 lease |
| dd. | May 14, 2021 | East Harper Unit lease |
| ee. | May 14, 2021 | Wright 14 lease |
| ff. | June 15, 2021 | Wright 14 lease |
| gg. | August 4, 2022 | Foster D lease Well #21 |
| hh. | February 16, 2023 | Foster Johnson Unit Satellite |
| ii. | March 14, 2023 | Gist Unit Well # 27 |
| jj. | June 6, 2023 | Foster Johnson Unit Satellite |
| kk. | June 6, 2023 | Gist et al lease |
| ll. | June 7, 2023 | Cowden 14 lease |
| mm. | June 7, 2023 | Wright 14 lease |

| nn. | June 7, 2023 | East Harper Unit lease |
|---|---|---|
| oo. | June 7, 2023 | 3600 Canterbury St. (corner of Canterbury and Westgate), Odessa, Texas |
| pp. | June 8, 2023 | Foster C lease |
| qq. | November 29-30, 2023 | Near intersection of W 42nd and Romans Ave, Odessa, Texas |
| rr. | December 6, 2023 | Near intersection of W 42nd and Romans Ave, Odessa, Texas |
| ss. | February 25, 2024 | Ector AZ Fee Lease |

A violation of Title 18, United States Code, Section 371.

## NOTICE OF UNITED STATES OF AMERICA'S DEMAND FOR FORFEITURE
### [*See* Fed.R.Crim.P. Rule 32.2]
### I.
### Safe Water Drinking Act Violations, Conspiracy, and Forfeiture Statutes

**[Title 42 U.S.C. §§ 300h-2(b), and Title 18 U.S.C. § 371, subject to forfeiture pursuant to Title 18 U.S.C. §§ 981(a)(1)(C), which is made applicable to criminal forfeiture by Title 28 U.S.C. § 2461(c)]**

74.     As a result of the foregoing criminal violations set forth in Counts Eight and Ten, the United States of America gives notice to Defendants AGHORN OPERATING, INC., and KODIAK ROUSTABOUT, INC., of its intent to seek the forfeiture of any property identified upon conviction pursuant to Fed. R. Crim. P. 32.2 and Title 18 U.S.C. § 981(a)(1)(C), which is made applicable to criminal forfeiture by Title 28 U.S.C. § 2461(c), which states:

Title 18 U.S.C. § 981. Civil Forfeiture

(a)(1) The following property is subject to forfeiture to the United States:
* * *
          (C)  Any property, real or personal, which constitutes or is derived from proceeds traceable to a violation . . . of this title or any offense constituting

"specified unlawful activity" (as defined in section 1956(c)(7) of this title), or a conspiracy to commit such offense.

Violations of Title 42 U.S.C. §§ 300h-2(b), and Title 18 U.S.C. § 371 are offenses constituting "specified unlawful activity" as defined in Title 18 U.S.C. § 1956(c)(7).

## II.

## Money Judgment

75.     A sum of money that represents the amount of proceeds the Defendants Aghorn and Kodiak obtained directly or indirectly as a result of the violations set forth above for which the Defendants Aghorn and Kodiak are liable.

## III.

## Substitute Property

76.     If any property subject to forfeiture for the violations set forth above, as a result of any act or omission of the Defendants Aghorn and Kodiak:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third party;

   c. has been placed beyond the jurisdiction of the court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States of America to seek forfeiture of any other property of the Defendants Aghorn and Kodiak, up to the value of said money judgment, as substitute property pursuant to Title 21 U.S.C. § 853(p) and Fed. R. Crim. P. 32.2(e)(1).

## SENTENCING ALLEGATIONS

77.     With respect to the charges in this Indictment, for purposes of determining the

maximum alternative fine pursuant to the Alternative Fines Act, 18 U.S.C. § 3571(d), the victims

suffered losses of approximately $3,160,716.

A TRUE BILL.

Original Signed by the
Foreperson of the Grand Jury

FOREPERSON OF THE GRAND JURY

**TODD KIM**
**ASSISTANT ATTORNEY GENERAL**
**ENVIRONMENT and NATURAL RESOURCES DIVISION**

BY:

CHRISTOPHER J. COSTANTINI
Senior Trial Attorney

BY:

MARK T. ROMLEY
Trial Attorney

27